640 S.E.2d 226

**TAX COMMISSIONER OF the STATE of West Virginia, Petitioner Below, Appellee**

v.

**MBNA AMERICA BANK, N.A., Respondent Below, Appellant.**

No. 33049.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 19, 2006.

Decided Nov. 21, 2006.

Dissenting Opinion of Justice Benjamin Jan. 2, 2007.

Concurring Opinion of Chief Justice Davis Jan. 8, 2007.

Darrell V. McGraw, Jr., Attorney General, Barbara H. Allen, Managing Deputy Attorney General, Katherine A. Schultz, Senior Deputy Attorney General, A.M. "Fenway" Pollack, Assistant Attorney General, Charleston, WV, for the Tax Commissioner.

G. Thomas Battle, Craig A. Griffith, Spilman, Thomas & Battle, Charleston, WV, and Arthur R. Rosen (Pro Hac Vice), Margaret C. Wilson (Pro Hac Vice), Donald M. Griswold (Pro Hac Vice), McDermott, Will & Emery, New York City, for MBNA America Bank.

MAYNARD, Justice:

Appellant MBNA America Bank appeals the June 27, 2005, order of the Circuit Court of Kanawha County that ruled that imposition of West Virginia's business franchise tax and corporation net income tax on MBNA, a Delaware Corporation, for tax years 1998 and 1999, does not violate the Commerce Clause. For the reasons that follow, we affirm the circuit court.

## I.

### FACTS

Appellant MBNA America Bank is a foreign corporation which has its principal place of business and commercial domicile in Wilmington, Delaware. During the two years in question, 1998 and 1999, MBNA had no real or tangible personal property and no employees located in West Virginia. The principal business of MBNA at the relevant times in this case was issuing and servicing VISA and MasterCard credit cards. This business included the extension of unsecured credit to customers who use these credit cards. MBNA promoted its business in West Virginia via mail and telephone solicitation.

As noted above, the two tax years at issue are 1998 and 1999. In 1998, MBNA's gross receipts attributable to West Virginia customers amounted to $8,419,431.00, and in 1999, its gross receipts amounted to

$10,163,788.00. For tax year 1998, MBNA paid a West Virginia Business Franchise Tax[1] of $32,010.00 and a West Virginia Corporation Net Income tax[2] of $168,034.00. For tax year 1999, MBNA paid a Business Franchise Tax in the amount of $42,339.00 and a Corporation Net Income Tax in the amount of $220,897.00.

Thereafter, MBNA filed refund claims with the State Tax Commissioner seeking the return of the business franchise and corporation net income taxes paid for 1998 and 1999, on the basis that the Tax Commissioner lacked jurisdiction over MBNA. The Commissioner denied the refunds based on its finding that MBNA regularly engaged in business in West Virginia under the applicable statutes.[3]

MBNA subsequently filed an appeal from the Tax Commissioner's decision with the Office of Tax Appeals (hereafter "OTA"). By decision dated October 22, 2004, the Chief Administrative Law Judge (hereafter "ALJ") of the OTA ruled in favor of MBNA and authorized refunds to MBNA of its 1998 and 1999 franchise and corporation net income taxes. The ALJ reasoned that under the Commerce Clause, a state may not subject an activity to a tax unless that activity has a "substantial nexus" with the taxing state. The ALJ further reasoned that a substantial nexus requires a finding that the putative taxpayer has a physical presence in the taxing state, and mere economic exploitation of the market is not sufficient. Because it was agreed that MBNA does not have a physical presence in West Virginia, the ALJ concluded that the State's business franchise and corporation net income taxes could not be imposed on MBNA's activity within the State.

The Tax Commissioner appealed the ALJ's decision to the Circuit Court of Kanawha County. The circuit court reversed the decision of the ALJ. According to the circuit court, physical presence is not necessary in order to show a substantial nexus for purposes of state taxation of foreign corporations. Rather, the circuit court found that MBNA's significant business in the state is sufficient to meet the substantial nexus standard. Therefore, concluded the circuit court, MBNA had a substantial nexus with West Virginia during the tax years in question so that imposition of the State's business franchise and corporate net income taxes on MBNA did not violate the Commerce Clause. MBNA now appeals the circuit court's order.

## II.

## STANDARD OF REVIEW

The Court has previously recognized that a lower court's determination of whether a state tax violates the Commerce Clause is reviewed *de novo*. See *Hartley Marine Corp. v. Mierke*, 196 W.Va. 669, 474 S.E.2d 599 (1996) (explaining that review of lower court judgment on whether state legislation interferes with free flow of interstate commerce is *de novo*).

## III.

## DISCUSSION

The single issue[4] raised in this appeal is whether application of West Virginia's busi-

---

1. The West Virginia Business Franchise Tax is found in W.Va.Code §§ 11–23–1, *et seq.* According to W.Va.Code § 11–23–1 (1985) the tax is imposed on corporations and partnerships for the privilege of doing business in this state.

2. The West Virginia Corporation Net Income Tax is found in W.Va.Code §§ 11–24–1, *et seq.*

3. The statutory nexus required for the business franchise tax is found in W.Va.Code § 11–23–5a(d) (1996), which states in part:
   A financial organization that has its commercial domicile in another state is presumed to be regularly engaging in business in this state if during any year it obtains or solicits business with twenty or more persons within this state, or if the sum of the value of its gross receipts attributable to sources in this state equals or exceeds one hundred thousand dollars.

   The statutory nexus required for the West Virginia corporation net income tax is found in W.Va.Code § 11–24–7b(d) (1996), which provides in part:
   A financial organization that has its commercial domicile in another state is presumed to be regularly engaging in business in this state if during any year it obtains or solicits business with twenty or more persons within this state, or if the sum of the value of its gross receipts attributable to sources in this state equals or exceeds one hundred thousand dollars.

ness franchise and corporation net income taxes to MBNA, a business with no physical presence in this state, violates the Commerce Clause of the United States Constitution.[5] In Article 1, § 8 of the United States Constitution, Congress is expressly granted the authority "[t]o regulate Commerce with foreign Nations, and among the several States." [6] The Supreme Court has determined that the Commerce Clause, in addition to being a positive grant of power to Congress, also acts to prevent certain state regulation that interferes with interstate commerce. *See South Carolina State Highway Dept. v. Barnwell Bros., Inc.,* 303 U.S. 177, 58 S.Ct. 510, 82 L.Ed. 734 (1938). This prohibition on state action is known as the "negative" or "dormant" Commerce Clause.

■ The Supreme Court's interpretation of the dormant Commerce Clause "has

evolved substantially over the years, particularly as that Clause concerns limitations on state taxation powers." *Quill Corp. v. North Dakota,* 504 U.S. 298, 309, 112 S.Ct. 1904, 1911, 119 L.Ed.2d 91 (1992) (citation omitted). In tracing this evolution, the Court has explained:

> Our early cases, beginning with *Brown v. Maryland,* 12 Wheat. 419, 6 L.Ed. 678 (1827), swept broadly, and in *Leloup v. Port of Mobile,* 127 U.S. 640, 648, 8 S.Ct. 1380, 1384, 32 L.Ed. 311 (1888), we declared that "no State has the right to lay a tax on interstate commerce in any form." We later narrowed that rule and distinguished between direct burdens on interstate commerce, which were prohibited, and indirect burdens, which generally were not. *See, e.g., Sanford v. Poe,* 69 F. 546 (C.A.6 1895), *aff'd sub. nom., Adams Express Co. v. Ohio State Auditor,* 165 U.S. 194, 220, 17 S.Ct. 305, 41 L.Ed. 683 (1897).

---

4. In its petition for appeal to this Court, MBNA also raised an assignment of error concerning fair apportionment of the taxes at issue. However, MBNA subsequently abandoned this assignment of error.

5. We are mindful that our task herein is a difficult one. The United States Supreme Court has acknowledged that its dormant Commerce Clause law "is something of a 'quagmire' and the 'application of constitutional principles to specific state statutes leaves much room for controversy and confusion and little in the way of precise guides to the States in the exercise of their indispensable power of taxation.'" *Quill Corp. v. North Dakota,* 504 U.S. 298, 315–316, 112 S.Ct. 1904, 1915, 119 L.Ed.2d 91 (1992) (quoting *Northwestern States Portland Cement Co. v. Minnesota,* 358 U.S. 450, 457–458, 79 S.Ct. 357, 362, 3 L.Ed.2d 421 (1959)). Likewise, this Court has characterized this area of the law as "nebulous at best," *Hartley Marine Corp.,* 196 W.Va. at 677, 474 S.E.2d at 607, and commented that,

> It would be a Herculean, if not impossible task, to review and harmonize the myriad decisions of the Supreme Court of the United States on the subject of interstate commerce and exactly what *incidents thereof* may be constitutionally taxed by the States. The dissenting opinions in many of those cases make clear that the task of reconciling all the decisions is more difficult than was the task of Theseus as he threaded his way through the famous Cretan Labyrinth in search of the Minotaur.

*J.C. Penney Co., Inc. v. Hardesty,* 164 W.Va. 525, 527, 264 S.E.2d 604, 607 (1979) (quoting *Roy Stone Transfer Corp. v. Messner,* 377 Pa. 234, 243–44, 103 A.2d 700, 705 (1954)).

6. An example of Congress's regulation of interstate commerce is found in 15 U.S.C. § 381(a) (2000), which provides that,

> No State, or political subdivision thereof, shall have power to impose, for any taxable year ending after September 14, 1959, a net income tax on the income derived within such State by any person from interstate commerce if the only business activities within such State by or on behalf of such person during such taxable year are either, or both, of the following:
>
> (1) the solicitation of orders by such person, or his representative, in such State for sales of tangible personal property, which orders are sent outside the State for approval or rejection, and, if approved, are filled by shipment or delivery from a point outside the State; and
>
> (2) the solicitation of orders by such person, or his representative, in such State in the name of or for the benefit of a prospective customer of such person, if orders by such customer to such person to enable such customer to fill orders resulting from such solicitation are orders described in paragraph (1).

Of relevance to the instant case is the fact that in the last two years bills have been introduced in both houses of Congress to amend 15 U.S.C. § 381 to apply to, in addition to tangible property, all other forms of property, services, and other transactions fulfilled from a point outside the State. *See* H.R. 1956, 109th Congress (April 28, 2005); H.R. 4845, 109th Congress (March 2, 2006); S. 2721, 109th Congress (May 4, 2006). These bills have not been enacted into law.

Western Live Stock v. Bureau of Revenue, *303 U.S. 250, 256–258, 58 S.Ct. 546, 549–550, 82 L.Ed. 823 (1938), and subsequent decisions rejected this formal, categorical analysis and adopted a "multiple-taxation doctrine" that focused not on whether a tax was "direct" or "indirect" but rather on whether a tax subjected interstate commerce to a risk of multiple taxation. However, in Freeman v. Hewit, 329 U.S. 249, 256, 67 S.Ct. 274, 278, 91 L.Ed. 265 (1946), we embraced again the formal distinction between direct and indirect taxation, invalidating Indiana's imposition of a gross receipts tax on a particular transaction because that application would "impos[e] a direct tax on interstate sales."*

*Quill,* 504 U.S. at 309–310, 112 S.Ct. at 1911. The Court subsequently abandoned formal distinctions in favor of looking at the practical effects of state taxing statutes. In *Complete Auto Transit, Inc. v. Brady,* 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977), the Court set forth the current test for determining whether a state tax violated the Commerce Clause. This Court recognized the *Complete Auto* test in Syllabus Point 1 of *Western Maryland Ry. Co. v. Goodwin,* 167 W.Va. 804, 282 S.E.2d 240 (1981), where we held that,

A state tax on interstate commerce will not be sustained unless it: "(1) has a substantial nexus with the State; (2) is fairly apportioned; (3) does not discriminate; and (4) is fairly related to the services provided by the State." *Maryland v. Louisiana,* [451] U.S. [725], [754], 101 S.Ct. 2114, 2133, 68 L.Ed.2d 576 (1981).[7] (Footnote added).

■ The current issue deals solely with the "substantial nexus" prong of the *Complete Auto* test. Specifically, we are asked to decide whether the substantial nexus standard can only be met by showing that the putative taxpayer has an actual physical presence in the taxing state. In answering

this question, we must consider the Supreme Court's decisions in *National Bellas Hess, Inc. v. Department of Revenue,* 386 U.S. 753, 87 S.Ct. 1389, 18 L.Ed.2d 505 (1967), *overruled, in part, Quill supra,*[8] and *Quill,* the Court's most recent pronouncement on state tax jurisdiction.

*Bellas Hess* involved an attempt by Illinois to require a mail-order business to collect and pay use taxes on goods purchased within the state. National Bellas Hess (hereinafter "National") was incorporated in Delaware and had its principal place of business in Missouri. It had neither outlets nor employees in Illinois. Twice a year, National mailed catalogues to the company's customers in Illinois. Orders for merchandise were mailed by customers to National's Missouri plant, and the ordered items were mailed to the customers either by mail or common carrier. National challenged the Illinois use tax levied against it on the basis, *inter alia,* that it created an unconstitutional burden on interstate commerce. The Supreme Court held that Illinois had no power to impose the use tax on National. The Court based its decision in part on the undue burden placed on interstate commerce by compliance with a host of administrative regulations governing the collection of sales and use taxes.

In 1992, the Supreme Court reaffirmed in *Quill* its *Bellas Hess* holding to the extent that *Bellas Hess* held that a showing of the taxpayer's physical presence in the taxing state was necessary to sustain a sales and use tax against a challenge under the Commerce Clause.[9] Quill was a Delaware corporation with offices and warehouses in Illinois, California, and Georgia. It sold office equipment and supplies, and solicited business through catalogs, flyers, advertisements in national periodicals, and telephone calls. Customers received their ordered merchandise from Quill through mail or common carrier. Despite the fact that Quill had no employees in North Dakota, and that its

---

7. This test is referred to in *Maryland v. Louisiana* as the *Complete Auto* test and is generally known by that name. Therefore, we refer to it as the *Complete Auto* test in this opinion.

8. *Quill* overruled *Bellas Hess* to the extent that *Bellas Hess* held that a showing of the taxpayer's

physical presence in the taxing state was necessary to sustain the constitutionality of a sales and use tax against a challenge under the Due Process clause.

9. *See* fn. 8, *supra.*

tangible property in North Dakota was "either insignificant or nonexistent," 504 U.S. at 302, 112 S.Ct. at 1907, Quill was required to collect a use and sales tax from its North Dakota customers and remit it to the state. Quill challenged imposition of the tax on the ground that North Dakota did not have the power to compel it to collect a use tax from its North Dakota customers.

In addressing this issue, the Supreme Court first indicated that in determining the propriety of a state use tax on an out-of-state corporation "the nexus requirements of the Due Process and Commerce Clauses are not identical." 504 U.S. at 312, 112 S.Ct. at 1913.[10] The analysis under the Due Process Clause, explained the Court, is comparable to that used in determining whether a State can exercise personal jurisdiction over a person. Specifically, there must be "some definite link, some minimum connection, between a state and the person, property, or transaction it seeks to tax." 504 U.S. at 306, 112 S.Ct. at 1909 (quoting Miller Brothers Co. v. Maryland, 347 U.S. 340, 344–345, 74 S.Ct. 535, 539, 98 L.Ed. 744 (1954)). This is in order to ensure that imposition of a duty to collect a use tax on an out-of-state corporation does not offend traditional notions of fairness. Further, the Court found that the minimum connection is satisfied where the business "is engaged in continuous and widespread solicitation of business within a State[ ] [because] [s]uch a corporation clearly has fair warning that [its] activity may subject [it] to the jurisdiction of the foreign sovereign." 504 U.S. at 308, 112 S.Ct. at 1911 (internal quotation marks and citations omitted). The Court concluded that the Due Process Clause does not require physical presence in a State

for the imposition of a duty to collect a use tax.

The Commerce Clause and its nexus requirement, in contrast, explained the Court, "are informed not so much by concerns about fairness for the individual defendant as by structural concerns about the effects of state regulation on the national economy.... Accordingly, we have ruled that [the Commerce] Clause ... bars state regulations that unduly burden interstate commerce." 504 U.S. at 312, 112 S.Ct. at 1913. (Citations omitted). "Thus, 'the substantial nexus' requirement is ... a means for limiting state burdens on interstate conference." 504 U.S. at 313, 112 S.Ct. at 1913. The Quill Court ultimately concluded that for purposes of imposing on an out-of-state business the duty of collecting use and sales taxes on in-state customers, the Complete Auto substantial nexus prong would best be determined by application of a "bright-line, physical-presence requirement." 504 U.S. at 317, 112 S.Ct. at 1916.

The major question left open by the Supreme Court's opinion in Quill is the one that now confronts us: Does the physical presence requirement applicable to determining the constitutionality of requiring out-of-state mail-order houses to collect use taxes on in-state sales under the Commerce Clause extend to other types of state taxes? MBNA's position is that Quill extends to the business franchise and corporation net income taxes at issue. The Tax Commissioner posits, on the other hand, that physical presence is not a requirement of the substantial nexus standard in regards to the taxes at issue.[11]

---

**10.** "Quill ... was the first [Supreme Court] decision to bifurcate the Due Process and Commerce Clause analyses used to determine a state's jurisdiction to tax under the U.S. Constitution." Christina R. Edson, Quill's Constitutional Jurisprudence And Tax Nexus Standards In An Age Of Electronic Commerce 49 Tax Lawyer 893, 894 (Summer 1996).

**11.** The Tax Commissioner cites several cases to this Court in support of its position that Quill's physical-presence requirement applies only to sales and use taxes including Lanco, Inc. v. Director of Taxation, 379 N.J.Super. 562, 879 A.2d 1234 (2005); A & F Trademark, Inc. v. Tolson,

167 N.C.App. 150, 605 S.E.2d 187 (2004), cert. denied, —— U.S. ——, 126 S.Ct. 353, 163 L.Ed.2d 62 (2005); Secretary, Dep't of Revenue, State of La. v. Gap (Apparel), Inc., 886 So.2d 459 (La.App. 2004); and Geoffrey, Inc. v. S.C. Tax Com'n, 313 S.C. 15, 437 S.E.2d 13 (1993). We find the persuasiveness of these cases to be limited, however, because the primary issue in each case is whether a state has jurisdiction to impose a state income tax on foreign corporations with no physical presence in the taxing state but whose intangibles, such as a trademark, are used in the state by a licensee. These courts reason, in part, that the intangibles located in the state provide a sufficient nexus for income tax purposes. In the

After careful consideration of the parties' arguments, the relevant legal authority, and the Court's reasoning in *Quill*, we conclude that *Quill's* physical-presence requirement for showing a substantial Commerce Clause nexus applies only to use and sales taxes and not to business franchise and corporation net income taxes. There are several reasons for our conclusion. First, we agree with the Tax Commissioner that a close reading of *Quill* indicates that its reaffirmation of the *Bellas Hess* physical-presence test for use and sales taxes under the Commerce Clause is grounded primarily on *stare decisis*. For example, the Court in *Quill* notes that "[w]hile contemporary Commerce Clause jurisprudence might not dictate the same result were the issue to arise for the first time today, *Bellas Hess* is not inconsistent with *Complete Auto* and our recent cases." *Quill,* 504 U.S. at 311, 112 S.Ct. at 1912. The Court further indicated that "the *Bellas Hess* rule has engendered substantial reliance and has become part of the basic framework of a sizable industry. The interest in stability and orderly development of the law that undergirds the doctrine of *stare decisis* therefore counsels adherence to settled precedent." *Id.,* 504 U.S. at 317, 112 S.Ct. at 1916 (internal quotations and citation omitted). Finally, the Court concluded that "the continuing value of a bright-line rule in this area and the doctrine and principles of *stare decisis* indicate that the *Bellas Hess* rule remains good law." *Id.*

This reasoning is supported by several legal commentators. *See* John A. Swain, *State Income Tax Jurisdiction: A Jurisprudential and Policy Perspective,* 45 Wm. & Mary L.Rev. 319 (October 2003) (arguing that the *Quill* Court relied on *stare decisis* rather than defending the physical presence test on the merits); Richard D. Pomp & Michael J. McIntyre, *State Taxation of Mail–Order Sales of Computers After Quill:*

*An Evaluation of MTC Bulletin 95–1,* 11 State Tax Notes 177, 179–80 (July 15, 1996) (maintaining that *Quill* is essentially a political decision responding to concerns about retroactivity and the practical consequences of overruling *Bellas Hess* ); Michael T. Fatale, *State Tax Jurisdiction and the Mythical "Physical Presence" Constitutional Standard,* 54 Tax Lawyer 105, 113 (Fall, 2000) (opining that "[a] primary basis for the [*Quill* ] holding was the Court's conclusion that the mail order industry had grown in large part in reliance on *Bellas Hess*[,] [and] [b]ecause the *Bellas Hess* rule had become the 'basic framework' of a sizable industry") (footnotes omitted). Thus, because *Quill's* physical-presence test for sales and use taxes was based in large part on the mail order industry's reliance on *Bellas Hess,* we are not compelled to apply *Quill's* physical presence standard to the present circumstances.

Second, the Supreme Court appears to have expressly limited *Quill's* scope to sales and use taxes. First, the *Quill* Court noted that "[a]lthough we have not, in our review of other types of taxes, articulated the same physical-presence requirement that *Bellas Hess* established for sales and use taxes, that silence does not imply repudiation of the *Bellas Hess* rule." *Quill,* 504 U.S. at 314, 112 S.Ct. at 1914. Also, the Court commented that "although in our cases subsequent to *Bellas Hess* and concerning other types of taxes we have not adopted a similar bright-line, physical-presence requirement, our reasoning in those cases does not compel that we now reject the rule that *Bellas Hess* established in the area of sales and use taxes." *Id.,* 504 U.S. at 317, 112 S.Ct. at 1916. We believe that a reasonable construction of this language clearly implies that *Quill* applies only to sales and use taxes and not to other types of state taxes.[12]

instant case, there is no claim that MBNA has intangibles in West Virginia that provide a sufficient nexus for tax purposes.

**12.** One legal commentator has interpreted these portions of the *Quill* opinion to mean that,

the Commerce Clause's physical presence requirement was not necessarily applicable to other tax types nor dictated by sound Com-

merce Clause jurisprudence and that the Court was motivated by principles of stare decisis flowing from *Bellas Hess.* It appears the Court intentionally left itself open for future decisions involving other types of taxes. Therefore, *Quill's* physical presence requirement may not apply to future non-use tax collection decisions.

Edson, 49 Tax Lawyer at 925.

Third, the *Bellas Hess* and *Quill* courts based their decisions in part on the fact that compliance with administrative regulations in the collection of sales and use taxes places an undue burden on interstate commerce. Specifically, the *Bellas Hess* Court explained:

> In order to uphold the power of Illinois to impose use tax burdens on National in this case, we would have to repudiate totally the sharp distinction ... between mail order sellers with retail outlets, solicitors, or property within a State, and those who do no more than communicate with customers in the State by mail or common carrier as part of a general interstate business. But this basic distinction, which until now has been generally recognized by the state taxing authorities, is a valid one, and we decline to obliterate it.

> ... For if Illinois can impose such burdens, so can every other State, and so, indeed, can every municipality, every school district, and every other political subdivision throughout the Nation with power to impose sales and use taxes. The many variations in rates of tax, in allowable exemptions, and in administrative and record-keeping requirements could entangle National's interstate business in a virtual welter of complicated obligations to local jurisdictions with no legitimate claim to impose a fair share of the cost of the local government.

> The very purpose of the Commerce Clause was to ensure a national economy free from such unjustifiable local entanglements. Under the Constitution, this is a domain where Congress alone has the power of regulation and control.

*Bellas Hess*, 386 U.S. at 758–760, 87 S.Ct. at 1392–1393 (internal quotation marks and footnotes omitted). According to the Court, at the time *Bellas Hess* was decided, local sales taxes were imposed by over 2,300 localities, many of them accompanied by a use tax, utilizing several different rates. *Id.*, 386 U.S. at 759 fn. 12 and fn. 13, 87 S.Ct. at 1393 fn. 12 and fn. 13.[13]

The *Quill* Court likewise recognized the potential burden on interstate commerce posed by North Dakota's sales and use taxes.

> North Dakota's use tax illustrates well how a state tax might unduly burden interstate commerce. On its face, North Dakota law imposes a collection duty on every vendor who advertises in the State three times in a single year. Thus, absent the *Bellas Hess* rule, a publisher who included a subscription card in three issues of its magazine, a vendor whose radio advertisements were heard in North Dakota on three occasions, and a corporation whose telephone sales force made three calls into the State, all would be subject to the collection duty. What is more significant, similar obligations might be imposed by the Nation's 6,000–plus taxing jurisdictions.

*Quill*, 504 U.S. at 313 fn. 6, 112 S.Ct. at 1913 fn. 6, *citing Bellas Hess*, 386 U.S. at 759–760, 87 S.Ct. at 1393 (noting that the "many variations in rates of tax, in allowable exemptions, and in administrative and record-keeping requirements could entangle [a mail-order house] in a virtual welter of complicated obligations") (additional citation omitted).

In contrast to the sales and use taxes described in *Bellas Hess* and *Quill*, the franchise and income taxes at issue in this case do not appear to cause the same degree of compliance burdens. As noted above, the task of collecting taxes and remitting them to the government demands knowledge of a multitude of administrative regulations, including various deductions and tax rates, as well as record-keeping requirements. Also, as a general matter, sales and use taxes must be remitted to the government on a more frequent basis than income and franchise taxes. For example, in West Virginia vendors are charged with the duty of collecting from purchasers the consumer sales and service tax and paying the tax to the Tax Commissioner on a monthly basis. This entails making out and mailing to the Commissioner a return for the preceding month on a prescribed form showing the total gross proceeds of the vendor's business during that

---

13. In Edson, 49 Tax Lawyer at 911, it is noted that in 1996, when that article was written, there

were over 6,100 state and local jurisdictions that imposed sales taxes using varied tax rates.

time, the gross proceeds of the vendor's business upon which the tax is based, the amount of the tax for which the vendor is liable, and any further information necessary in the computation and collection of the tax which the Commissioner may require. *See* W.Va. Code § 11–15–16 (2003). In contrast, income and franchise taxes are paid by the business entity itself so that no collection duties are involved. Also, income and franchise taxes are generally paid annually. *See e.g.*, W.Va. Code § 11–23–9 (1996) (persons subject to business franchise tax shall make and file an annual return) and W.Va.Code § 11–24–13 (1993) [14] (requiring annual filing of corporation net income tax return).[15]

Finally, we believe that the *Bellas Hess* physical-presence test, articulated in 1967, makes little sense in today's world. In the previous almost forty years, business practices have changed dramatically. When *Bellas Hess* was decided, it was generally necessary that an entity have a physical presence of some sort, such as a warehouse, office, or salesperson, in a state in order to generate substantial business in that state. This is no longer true. The development and proliferation of communication technology exhibited, for example, by the growth of electronic commerce now makes it possible for an entity to have a significant economic presence in a state absent any physical presence there. For this reason, we believe that the mechanical application of a physical-presence standard to franchise and income taxes is a poor measuring stick of an entity's true nexus with a state.

Accordingly, we now hold that the United States Supreme Court's determination in *Quill Corp. v. North Dakota*, 504 U.S. 298, 112 S.Ct. 1904, 119 L.Ed.2d 91 (1992), that an entity's physical presence in a state is required to meet the "substantial nexus" prong of *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977), applies only to state sales and use

taxes and not to state business franchise and corporation net income taxes.

■ Rather than a physical presence standard, this Court believes that a significant economic presence test is a better indicator of whether substantial nexus exists for Commerce Clause purposes. At least one legal commentator has suggested such a test and to some degree defined its parameters. *See* Edson, 49 Tax Lawyer at 943. According to this commentator, a substantial economic presence standard "incorporates due process 'purposeful direction' towards a state while examining the degree to which a company has exploited a local market." *Id.* Further, "[a] substantial economic presence analysis involves an examination of both the quality and quantity of the company's economic presence." *Id.*, 49 Tax Law. at 944. Finally, under this test, "[p]urposeful direction towards a state is analyzed as it is for Due Process Clause purposes," and the Commerce Clause analysis requires the additional examination of "the frequency, quantity and systematic nature of a taxpayer's economic contacts with a state." *Id.*, 49 Tax Law. at 945. We find this rationale persuasive and will apply it in determining the constitutionality of the taxes at issue.

First, however, we must address several objections proffered by MBNA to the application of any standard other than physical presence. Initially, MBNA contends that a greater nexus requirement should be applied to the imposition of direct taxes such as those at issue because such taxes are actually more burdensome. This is because sales and use taxes merely require an entity to collect the tax from consumers and remit the tax money to the government, thus suffering the administrative complications and inconvenience but not the cost of the tax. In sharp contrast, says MBNA, franchise and income taxes not only have compliance burdens but also must be paid from the entity's own pocket. For support, MBNA cites *National Geographic Society v. California Bd. of Equalization*,

---

14. We note, however, that taxpayers whose liability for these taxes exceeds a specified amount are charged with paying estimated taxes for the taxable year on a quarterly basis. *See* W.Va. Code § 11–23–13 (1987).

15. Of course, administrative regulations involved in the payment of any type of tax most likely would not be a concern today due to the common use of computers and the availability of specialized software.

430 U.S. 551, 97 S.Ct. 1386, 51 L.Ed.2d 631 (1977), in which the Supreme Court distinguished between a use tax and a direct tax and implied that a higher Commerce Clause standard would be required to support the imposition of a direct tax.[16]

We do not agree with MBNA's argument on this issue. Notably, the Supreme Court's comment in *National Geographic Society* was dicta in that it was not necessary to the decision in that case. In contrast, the *Bellas Hess* and *Quill* Courts placed significant weight on the fact that there are substantial compliance burdens attached to the collection of sales and use taxes. Therefore, we reject MBNA's claim that the imposition of direct taxes is a greater burden than the duty to collect taxes so that the *Bellas Hess/Quill* physical-presence test should also apply to the imposition of the direct taxes at issue.[17]

MBNA also argues that adoption of any substantial nexus requirement short of showing actual physical presence is in fact simply applying a Due Process minimum contacts standard in violation of *Quill* which expressly held that the Due Process and Commerce Clause analyses are separate. We disagree. The Due Process Clause requires merely some minimum connection between a state and the person, property or transaction it seeks to tax. In contrast, a substantial nexus under the Commerce Clause requires that an entity's contacts with the taxing state be more frequent and systematic in nature. Additionally, an entity's exploitation of the market must be greater in degree than under the Due Process standard so that its economic presence can be characterized as significant or substantial. In sum, although a substantial economic presence standard is by nature more elastic than the bright-line physical presence test, we are convinced that when properly applied, a greater nexus is required under the substantial economic presence standard that under the minimum contacts analysis.

Finally, MBNA avers that the only case from a foreign jurisdiction that is factually on point with the instant case is *J.C. Penney Nat'l Bank v. Johnson*, 19 S.W.3d 831 (Tenn. Ct.App.1999), in which the Tennessee appellate court applied the physical-presence test to Tennessee's attempted imposition of income taxes on an out-of-state credit card company. While we acknowledge that *J.C. Penney* is factually on point and addresses the same issue as the one before us, for the reasons set forth above we reject the reasoning in *J.C. Penney*, and decline to apply it to the instant case.[18]

■ We now turn our attention to the facts of the instant case to determine whether MBNA had a substantial nexus with this State during the time period in question. The record shows that MBNA continuously and systematically engaged in direct mail and telephone solicitation and promotion in West Virginia. Further, in tax year 1998,

16. Specifically, the Court in *National Geographic Society* reasoned that,

The case for the validity of the imposition upon the out-of-state seller enjoying such services of a duty to collect a use tax is even stronger. The out-of-state seller runs no risk of double taxation. The consumer's identification as a resident of the taxing State is self-evident. The out-of-state seller becomes liable for the tax only by failing or refusing to collect the tax from that resident consumer. Thus, the sole burden imposed upon the out-of-state seller by statutes [imposing a use tax] is the administrative one of collecting it.

430 U.S. at 558, 97 S.Ct. at 1391 (citations omitted).

17. MBNA notes that in *Western Maryland Ry. Co. v. Goodwin*, 167 W.Va. 804, 826 n. 3, 282 S.E.2d 240, 253 n. 3 (1981), this Court quoted with approval a party's brief for the proposition that "the form of the tax is irrelevant to the due process questions of nexus and state benefits." This statement does not inform our present analysis for several reasons. First, it is dicta. Second, it was prior to the Supreme Court's bifurcation of Due Process and Commerce Clause analyses. Finally, it was prior to the distinction made by the *Quill* Court between the test to be used in determining the constitutionality of sales and use taxes versus other types of state taxes.

18. MBNA also argues that physical presence has been a base-line fact in every tax nexus case decided by the Supreme Court since *Complete Auto*. In other words, says MBNA, the Supreme Court has never upheld a finding of nexus in any case involving a state tax where the putative taxpayer had no in-state presence. It is equally true, however, as noted by the Commissioner, that no Supreme Court decision has applied the *Bellas Hess* physical presence requirement to a state income tax. Thus, we are not persuaded by MBNA's argument.

MBNA had significant gross receipts attributable to West Virginia customers in the amount of $8,419,431.00, and in tax year 1999, MBNA had significant gross receipts attributable to its West Virginia customers in the amount of $10,163,788.00. In light of these facts, this Court has no trouble concluding that MBNA's systematic and continuous business activity in this State produced significant gross receipts attributable to its West Virginia customers which indicate a significant economic presence sufficient to meet the substantial nexus prong of *Complete Auto.*[19]

Finally, prior to concluding, we simply wish to acknowledge the great challenge in applying the Commerce Clause to the ever-evolving practices of the marketplace. James Madison, Benjamin Franklin, and the other Framers at the Constitutional Convention who adopted the Commerce Clause lived in a world that is impossible for people living today to imagine. The Framers' concept of commerce consisted of goods transported in horse-drawn, wooden-wheeled wagons or ships with sails. They lived in a world with no electricity, no indoor plumbing, no automobiles, no paved roads, no airplanes, no telephones, no televisions, no computers, no plastic credit cards, no recorded music, and no iPods. Likewise, it would have been impossible for the Framers to imagine our world. When they fashioned the Commerce Clause, they could not possibly have foreseen the complex and varied ways that commerce is conducted today, especially via the internet and electronic commerce. It would be nonsense to suggest that they could foresee or fathom a time in which a person's telephone call to his or her local credit card company would be routinely answered by a person in Bombay, India, or that a consumer could purchase virtually any product on a computer with the click of a mouse without leaving home. This recognition of the staggering evolution in commerce from the Framers' time up through today suggests to this Court that in applying the Commerce Clause we must eschew rigid and mechanical legal formulas in favor of a fresh application of Commerce Clause principles tempered with healthy doses of fairness and common sense. This is what we have attempted to do herein.

## IV.

## CONCLUSION

In conclusion, for the reasons set forth above, we affirm the June 27, 2005, order of the Circuit Court of Kanawha County and conclude that West Virginia's imposition of its business franchise and corporation net income taxes on MBNA for the tax years 1998 and 1999, did not violate the Commerce Clause.

Affirmed.

BENJAMIN, Justice, dissenting:

(Filed January 2, 2007)

In its opinion finding tax liability for an out-of-state corporation with no presence, tangible or intangible,[1] in West Virginia on income realized out-of-state by that corporation from accounts kept out-of-state, the majority, in its opinion, boldly goes where no court has gone before. In doing so, the majority relies not on bedrock constitutional principles or on established legal precedent, but rather on legal commentaries with thinly veiled state-favoring taxing agendas, a strained and inaccurate reading of the United States Supreme Court's decision in *Quill Corp. v. North Dakota,* 504 U.S. 298, 112 S.Ct. 1904, 119 L.Ed.2d 91 (1992), and a unilateral restatement of the important poli-

---

**19.** MBNA also asserts that the circuit court confused the first prong of the *Complete Auto* test with the fourth prong in determining the validity of the taxes at issue. We need not decide this issue because this Court's analysis is based entirely on the "substantial nexus" prong of *Complete Auto*. It is axiomatic that "[t]his Court may, on appeal, affirm the judgment of the lower court when it appears that such judgment is correct on any legal ground disclosed by the record, regardless of the ground, reason or theory assigned by

the lower court as the basis for its judgment." Syllabus Point 3, *Barnett v. Wolfolk,* 149 W.Va. 246, 140 S.E.2d 466 (1965).

**1.** See Majority Opinion, 220 W.Va. 163, page 164, 640 S.E.2d page 227 ("... MBNA had no real or tangible personal property ... in West Virginia.") and Note 11, page 168, 640 S.E.2d pgs. 231–32 (In the instant case, there is no claim that MBNA has intangibles in West Virgi-

cy considerations which led to the inclusion of the Commerce Clause within the United States Constitution because, according to the majority opinion, the framers could not possibly have foreseen the future. The majority opinion gives legal sanction to a state taxing scheme which impermissibly burdens the interstate commerce of the nation. I therefore dissent.

There is no precedential support whatsoever for the conclusions reached by the majority decision. None. None at the state level. None at the federal level. Ignoring that our consideration here should be the effect of the tax in question on interstate commerce, rather than the type of tax it is, none of the rhetoric raised by the majority opinion explains why a state's imposition of a tax on an out-of-state corporation with no presence, tangible or intangible, on income realized from an out-of-state account does not adversely affect the nation's interstate commerce, an analysis identified by the United States Supreme Court as the cornerstone of constitutional jurisprudence. *Id.*; *Allied–Signal, Inc. v. Director, Div. of Taxation*, 504 U.S. 768, 112 S.Ct. 2251, 119 L.Ed.2d 533 (1992). The only state court decision on point with the specific credit card issues raised herein determined that the State of Tennessee exceeded its taxing jurisdiction in attempting to collect taxes from an out-of-state corporation on income generated by out-of-state credit accounts. *J.C. Penney National Bank v. Johnson*, 19 S.W.3d 831 (Tenn.Ct.App.1999), *cert. denied*, 531 U.S. 927, 121 S.Ct. 305, 148 L.Ed.2d 245 (2000);

State taxation of companies engaged in interstate commerce must comport with the Due Process and Commerce Clauses of the United States Constitution. In *Quill*, the United States Supreme Court emphasized that separate constitutional analyses are required in evaluating the validity of state taxes under each provision. *Quill*, 504 U.S. at 305, 112 S.Ct. 1904 ("The two constitutional

requirements differ fundamentally [and] reflect different constitutional concerns."). Though both the Due Process Clause and the Commerce Clause require an out-of-state taxpayer to have established a meaningful nexus with a given state to be the proper subject of taxation of that state, imposition of a tax on an out-of-state taxpayer may meet the less stringent nexus requirements of the Due Process Clause, yet fail to meet the more substantial nexus requirements of the Commerce Clause. *Id.* ("[W]hile a State may, consistent with the Due Process Clause, have the authority to tax a particular taxpayer, imposition of the tax may nonetheless violate the Commerce Clause.")

Among the most fundamental precepts of state taxation from a Commerce Clause perspective is that there must be a "substantial nexus" between the interstate activity sought to be taxed and the taxing State. *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977). Under *Complete Auto*, a state tax is permitted under the Commerce Clause if it (1) is applied to an activity with a substantial nexus with the taxing state, (2) is fairly apportioned, (3) does not discriminate against interstate commerce, and (4) is fairly related to the services provided by the state. 430 U.S. at 279, 97 S.Ct. 1076.[2] While I agree with my colleagues that the "substantial nexus" prong of this test is ripe for clarification by the United States Supreme Court, I disagree with them to the extent that the majority opinion finds insufficient guidance in the existing jurisprudence of the United States Supreme Court to conclude that the State's present attempt to levy a tax on income realized outside the State by an out-of-state corporation with no presence, tangible or intangible, in the State violates the Commerce Clause.

Three years after deciding *Complete Auto*, the Supreme Court noted in *Mobil Oil Corp. v. Commissioner of Taxes*, 445 U.S. 425, 100 S.Ct. 1223, 63 L.Ed.2d 510 (1980), that for an

---

nia "that provide a sufficient nexus for tax purposes.")

**2.** There is often overlap in the consideration of these four requirements. The "substantial nexus" requirement is said to protect against undue burdens on interstate commerce while fair apportionment is understood to guard against taxes

which have the effect of "pass[ing] an unfair share of the tax burden onto interstate commerce." *Quill*, 504 U.S. at 313, 112 S.Ct. 1904. In practical effect, the exercise of multiple taxation by several states under the apportionment standard may lead to apportionment issues which likewise should be considered under the "substantial nexus" standard.

application of state tax jurisdiction to be constitutional under the Due Process Clause, there must be: (1) nexus or some *minimal* connection between the taxing state and the activity from which the income is derived; and (2) a rational relationship between the income attributed to the taxing state and the interstate values of the enterprise. 445 U.S. at 436–7, 100 S.Ct. 1223. These constitutional requirements were subsequently confirmed in *D.H. Holmes Co. v. McNamara*, 486 U.S. 24, 108 S.Ct. 1619, 100 L.Ed.2d 21 (1988), *Allied–Signal,* and *Quill.*

Reading *Complete Auto* and *Mobil Oil* together, one discerns two aspects to the consideration of nexus. First, there must be an adequate connection between the taxing state and the out-of-state corporation upon which a tax is being assessed; *i.e.,* a "presence" consideration. Second, there must also be an adequate connection between the taxing state and the event which gives rise to the claimed tax; *i.e.,* a "transaction" consideration.

Prior to the United States Supreme Court's decisions in *Allied–Signal* and *Quill,* some argued for a merging of the Due Process and Commerce Clause nexus considerations through application of a so-called "economic exploitation" nexus consideration. *Quill* establishes that, for Commerce Clause purposes, a higher presence nexus is required than the minimal nexus connection required for Due Process purposes. In other words, a corporation's "presence" may suffice for taxing jurisdiction under the minimal Due Process nexus test, but fail to meet the "substantial" higher presence nexus test required by the Commerce Clause.

We must assume that the United States Supreme Court chose its words carefully in setting forth the first prong of the *Complete Auto* test, that the tax in question is sought by the taxing state to be applied "to an activity" with a substantial nexus with the taxing state. Even if the majority opinion was correct, which I believe it was not, that MBNA's interstate activities constitute a sufficiently high showing of presence to permit

taxing jurisdiction under the "substantial" nexus test of the Commerce Clause, the majority opinion simply reaches the question of whether the State of West Virginia may seek to tax MBNA as an out-of-state corporation. The majority opinion completely fails to consider the effect of the tax on interstate commerce. On this second question of whether a state can impose tax on income generated out-of-state, the majority opinion likewise fails. Here, there is no question but that the credit card accounts which give rise to MBNA's income are located outside West Virginia.

I must admit to being intrigued by the majority opinion's description of its nexus requirement as a "significant economic presence test" as much for its vagueness as for its embodiment as the antithesis of the "bright line" standards set forth by the United States Supreme Court in *Quill* and *National Bellas Hess v. Department of Revenue of Illinois,* 386 U.S. 753, 87 S.Ct. 1389, 18 L.Ed.2d 505 (1967), *overruled, in part, by Quill.* The reality is that by endorsing a nexus standard which permits West Virginia to assess a tax on an out-of-state corporation with no property, tangible or intangible, in this state on income realized from credit accounts maintained and serviced in another state, the majority merges the nexus requirements of the Due Process Clause and the Commerce Clause and effectively returns to the merged nexus jurisprudence of 1967, in *Bellas Hess,* albeit with the minimal due process requirements now carrying the day for nexus determination rather that the physical presence requirement of *Bellas Hess.* While MBNA may meet the minimal nexus requirement for it to be on notice from a due process basis that it may be subject to taxation, the majority opinion fails to show how the out-of-state credit account, which is the basis for the income sought to be taxed, meets the substantial nexus requirements of *Complete Auto* and *Quill.* Indeed, one might seriously question the due process basis for West Virginia's attempted actions herein.[3]

3. One might well argue that the State of West Virginia, under the facts of this case, is attempting to engage in extraterritorial taxation. "Under both the Due Process and the Commerce

Clauses of the Constitution, a State may not, when imposing an income-based tax, 'tax value earned outside its borders.'" *Container Corp. of America v. Franchise Tax Bd.,* 463 U.S. 159, 164,

The majority opinion attempts mightily to distinguish between forms of taxes, such as sales and use taxes on the one hand, and income and franchise taxes on the other hand, in attempting to defend its disregard for the substantial nexus standards required in *Quill*. The majority's argument appears to be that because the instant case concerns the taxation of income realized by an out-of-state corporation from accounts in Delaware and because *Quill* instead involved use and sales taxes from purchases made by purchasers within the taxing state with delivery of goods to occur also within the taxing state, this Court is at liberty to disregard those parts of *Quill* with which it disagrees. This argument is not persuasive. In so disregarding the substantial nexus requirements of *Quill* because *Quill* involved use and sales taxes, it is interesting that the majority opinion nevertheless fully embraces the precedent of the United States Supreme Court in *Complete Auto*, a case which also involved use and sales taxes—not income taxes. Perhaps the real dichotomy here may not be between sales and income taxes, with the relevant question being when is a tax not a tax, but how the limitations set forth in the United States Constitution can be avoided to provide the State with a better opportunity to expand its taxing opportunities.

The reality is that the United States Supreme Court has not generally treated the question of state authority to tax interstate commerce as turning on the specific type of tax involved. Rather, the United States Supreme Court has focused instead on the effect of the tax which the taxing state seeks to levy on interstate commerce, regardless of the type of tax.[4] Indeed, there is no immediately clear doctrinal foundation which can be observed for distinguishing sales and use tax collection on sales between states from income taxes sought to be collected from out-of-state companies for income realized from out-of-state intangible accounts simply because the out-of-state corporation availed itself of the United States mails and other forms of interstate communication.[5]

The jurisprudential reality is that the United States Supreme Court has never held in any state tax case that the nexus requirements of the Commerce Clause can be satisfied in the absence of a taxpayer's physical presence in the taxing state. The principles of *stare decisis* are no less relevant to state taxes in general, than they are to sales and use taxes particularly, when Congress has the ultimate power to prescribe the appropriate law in this area. *See, Quill*, 504 U.S. at 316–17, 112 S.Ct. 1904. Cases decided by the United States Supreme Court both before and after *Quill* have made it clear that a substantial nexus is required for the imposition of *any* state tax on an out-of-state corporation. *See, Allied–Signal*, 504 U.S. at 778, 112 S.Ct. 2251 ("The constitutional question in a case such as *Quill Corp.* is whether the State has the authority to tax the corporation at all."); *Commonwealth Edison Co. v. Montana*, 453 U.S. 609, 626, 101 S.Ct. 2946, 69 L.Ed.2d 884 (1981) ("Under this threshold test, the interstate business must have a substantial nexus with the State before *any* tax may be levied on it.") It would be a strange constitutional doctrine that would countenance one nexus standard for sales and use taxes under the Commerce Clause,

103 S.Ct. 2933, 2939, 77 L.Ed.2d 545, 552 (1983) (quoting *ASARCO Inc. v. Idaho State Tax Comm'n*, 458 U.S. 307, 315, 102 S.Ct. 3103, 3108, 73 L.Ed.2d 787, 794 (1982)).

4. In *Tyler Pipe Industries v. Washington State Department of Revenue*, 479 U.S. 1015, 107 S.Ct. 664, 93 L.Ed.2d 717 (1986), the tax in question was a business and occupation tax. The Court framed the nexus question as whether the activities performed in the taxing state on behalf of Tyler Pipe was significantly associated with Tyler Pipe's ability to establish and maintain a market for its sales. This case involved the imposition of a direct tax, similar to the income tax at issue herein.

5. In *Quill*, the Supreme Court while noting that it had not "in our review of other types of taxes, articulated the same physical presence requirement that *Bellas Hess* established for sales and use taxes," stated that "silence does not imply repudiation of the *Bellas Hess* rule." *Quill*, 504 U.S. at 314, 112 S.Ct. 1904. In *Bellas Hess*, the Supreme Court described its decision in *Scripto, Inc. v. Carson*, 362 U.S. 207, 80 S.Ct. 619, 4 L.Ed.2d 660 (1960), a case involving a corporation physically present in the taxing state, as the Court's "furthest constitutional reach to date" of subjecting a corporation to state taxing. *Bellas Hess*, 386 U.S. at 757, 87 S.Ct. 1389.

and a more relaxed nexus standard for corporate net income and other state taxes.[6]

In the first place, it does not appear that the differences between the use tax collection obligation and liability for income taxation are so significant as to justify different rules under the Commerce Clause. It is certainly difficult to see distinctions that give effect to physical presence as a necessary element for "substantial nexus" for some taxes and not for others. Arguably, the collection of use and sales taxes involves no more complexity than the determination of individual state income tax liability for a multistate corporation involved in interstate commerce where each taxing state has separate laws and seeks to maximize the definition of that which each such state contends may be taxed from out-of-state.[7] Arguably, if taxes should be treated differently under the Commerce Clause based on what the taxing state claims to tax rather than on the tax's actual impact on interstate commerce, one might well argue that something more than a due process minimal nexus standard should be considered for non-transactional taxes such as income taxes. Under such an argument, one might be tempted to argue that the minimum nexus standard for due process considerations in cases such as *Quill*, which involved transactions which had a tangible connection with a given state, were not intended to also apply to income taxes which a taxing state sought to apply to income generated by accounts located outside the taxing state. As this

endeavor demonstrates, the same speculation which the majority employs to attempt to differentiate "substantial nexus" standards based on tax types could be alternatively applied in any number of ways not so attractive to taxing states. Absent precedential support for differentiating "substantial nexus" standards based upon tax types, this Court should resist the State's invitation for us to speculate based on semantics and, instead, focus on the effect which the state tax has on interstate commerce—here, attempting to levy an income tax on an out-of-state corporation with no property, tangible or intangible, in West Virginia where the income in question was generated from credit accounts held outside of this state.

The majority opinion also claims that a variety of changes—changes which it claims were not of a type which could be foreseen by the framers of the United States Constitution—support their extension of state tax jurisdiction into a realm considered by all others to be unconstitutional. Initially, I note some measure of foreboding anytime a court invokes the "foreseeability of the framers'" as a basis for a decision—fear not because the rule of *stare decisis* is about to be followed by the court, but rather because the court is about to engage in some form of legislative activism for which the only support is political, not legal.[8] Here, the rationale for the majority's "economic exploitation" nexus approach, which

6. Contrary to the apparent contempt held by some for the benefits of "bright line" rules which avoid undue burdens on interstate commerce by the demarcation of a discrete realm of commercial activity that is free from interstate taxation, one might consider not only the settled expectations of taxpayers, but also the benefit to the national economy that such "bright lines" have been in the development of that economy over the last several decades. Surely interstate commerce is as worthy of protection from improper income and other taxes as it is from sales and use taxes. *See, Quill*, 504 U.S. at 315, 112 S.Ct. 1904.

7. Assume for the moment that a Delaware bank maintains a credit account for a customer with a Weirton, West Virginia mailing address. Assume further that that customer travels to Steubenville, Ohio and, using his credit account, makes a sizeable electronic purchase with the intent of paying for his purchase over several months. At

the end of the month, the customer electronically pays a portion of his credit account balance from his place of employment using funds he has in his Pittsburgh, Pennsylvania bank account. In such a scenario, which fully involves the interstate nature of today's economy, how should the Delaware bank maintain its records for determination of income taxes?

8. I must admit to some disdain for the rather elite nature of "foreseeability of the framers" arguments. Frequently, such invocations serve no purpose other than an attempt to excuse legislating from the bench. Other times, such invocations simply serve as the argument of last resort by courts searching for a legal basis to justify result-based decision-making. Caution should by necessity be the watchword when any court seeks to expand the power of the State on the basis of the "foreseeability of the framers" argument.

might more accurately be termed a "tax it if you can follow it, even if it is earned in another state" nexus approach, rings remarkably like the arguments set forth in Justice Fortas' dissent in *Bellas Hess*. In his dissent to the 1967 case, Justice Fortas advocated for an "economic exploitation nexus" test for state taxing jurisdiction. *Bellas Hess*, 386 U.S. at 761–62, 87 S.Ct. 1389. Justice Fortas argued that Bellas Hess should be subject to the taxing jurisdiction of Illinois because of its "large-scale, systematic, continuous solicitation and exploitation of the Illinois consumer market." *Id.*, at 761, 87 S.Ct. 1389. Furthermore, Justice Fortas argued that Bellas Hess enjoyed "... the benefits of, and profits from the facilities nurtured by, the State of Illinois as fully as if it were a retail store or maintained salesmen therein." *Id.*, at 762, 87 S.Ct. 1389. I find it remarkable that our Court now endorses this same position—a position which the United States Supreme Court has rejected.

Yet our Court has not been the only court to embrace Justice Fortas' arguments. So too did the North Dakota Supreme Court, in its decision in *Quill*. Therein, that state supreme court, also claiming changes in society and economy, stated that "... within the context of contemporary society and commercial practice, we conclude that the concept of nexus encompasses more than mere physical presence within the state, and that the determination of nexus should take into consideration all connections between the out-of-state seller and the state, all benefits and opportunities provided by the State, and should stress economic realities rather than artificial benchmarks." *State By and Through Heitkamp v. Quill Corp.*, 470 N.W.2d 203, 215 (N.D.1991), *rev'd*, 504 U.S. 298, 112 S.Ct. 1904, 119 L.Ed.2d 91 (1992). As *Quill* demonstrates, when given the chance to again consider the "economic exploitation" nexus argument, the United States Supreme Court once again declined.

While the majority herein apparently believes, as did the North Dakota Supreme Court in *Quill*, that it may disregard the actual nexus decisions of the United States Supreme Court in favor of a theoretical nex-us argument which favors the State's ability to reach out and tax income generated out-of-state by an out-of-state corporation with no presence, tangible or intangible, in West Virginia, I believe the sage reminder of Justice Scalia (joined in by Justices Kennedy and Thomas) should serve as a reminder of our duty in considering this case:

> We have recently told lower courts that "[i]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, [they] should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 109 S.Ct. 1917, 1921, 104 L.Ed.2d 526 (1989).

*Quill*, 504 U.S. at 321, 112 S.Ct. 1904. We would do well to follow the precedent that is applicable herein and not attempt to anticipate an overruling by the United Supreme Court of its prior jurisprudence. The taxes in question are unconstitutional.

DAVIS, Chief Justice, concurring:

(Filed January 8, 2007)

In this case, MBNA, an out-of-state credit card company disputed the imposition of business franchise and corporation net income taxes on its profits [1] generated from West Virginia residents in the years 1998 and 1999. The majority opinion, applying sound legal analysis, determined that the application of the taxes did not violate the Commerce Clause because MBNA's business activity in this State constituted a significant economic presence sufficient to meet the substantial nexus standard. I fully concur in the majority decision and its analysis. I have chosen to write separately to emphasize the correctness of the legal analysis articulated in the majority decision and, further, to respond to several misconceptions contained in the dissenting opinion.

In the lone dissenting opinion, my colleague chastises the majority and states that "[t]here is no precedential support whatsoever for the conclusions reached by the majority decision. None. None at the state level. None at the federal level." *See* Dissenting

---

1. In 1998, MBNA had gross profits of $8,419,431.00 from its West Virginia customers. In 1999, the gross profits were $10,163,788.00.

*See* Majority opinion, pgs. 164–65, 640 S.E.2d pgs. 227–28.

opinion, pgs. 173–74, 640 S.E.2d pgs. 236–37. The critical point that the dissent fails to acknowledge is that there is no established precedent, either way, from the United States Supreme Court. The sole decision on this topic is from the Tennessee Court of Appeals. *See generally J.C. Penney Nat'l Bank v. Johnson,* 19 S.W.3d 831 (Tenn.Ct. App.1999). It has long been held that "[i]n considering and deciding the constitutionality of a tax imposed and collected by this state, in the light of a provision of the Constitution of the United States, this Court is bound by applicable decisions of the Supreme Court of the United States[.]" Syl. pt. 2, in part, *State ex rel Battle v. B.D. Bailey & Sons, Inc.,* 150 W.Va. 37, 146 S.E.2d 686 (1965). However, no such requirement exists as to decisions rendered by other state courts. Moreover, it is expressly left to each state to regulate commerce inside its borders, within the confines of constitutional directives.

The majority opinion performed a critical analysis of the United States Supreme Court decision in *Quill Corp. v. North Dakota,* 504 U.S. 298, 112 S.Ct. 1904, 119 L.Ed.2d 91 (1992). The *Quill* opinion considered the Commerce Clause in connection with use and sale taxes, not the types of taxes at issue in the present case. Therefore, while the *Quill* opinion is instructive, it is not exactly on point with the case *sub judice.* The majority opinion succinctly interpreted the *Quill* decision, which determined that a physical presence was needed prior to imposing in-state sales taxes on an out-of-state mail-order house under the Commerce Clause. In its analysis, the majority of this Court correctly observed that physical presence is not a requirement of the substantial nexus standard with regard to the taxes at issue herein. Taking into account the realism of today's world, the majority astutely recognized that *Quill's* physical presence requirement for showing a substantial nexus under the Commerce Clause applies only to use and sales taxes and not to business franchise and corporation net income taxes, which are the taxes at issue in the present case. Such an interpretation was invited by the *Quill* Court when it noted that it has not adopted a bright line, physical presence requirement in any area except sales and use taxes. *See* Majori-

ty opinion, p. 169, 640 S.E.2d p. 232. In its interpretation of *Quill,* the majority opinion correctly recognized the legal differences between the Due Process Clause and the Commerce Clause, as well as the even finer distinctions between the application of sales and use taxes as opposed to business franchise and corporation net income taxes. The majority opinion articulates and appreciates these distinctions; the dissenting opinion does not.

Further, the dissenting opinion, in its discussion regarding the physical presence component of the substantial nexus prong, strays from the issue before this Court by discussing at length the minimum contacts required under the Due Process Clause. In so doing, the dissenting opinion accuses the majority of merging Due Process and Commerce Clause nexus requirements. However, the majority opinion correctly addresses this argument, which was first raised by MBNA, by recognizing the contact requirements under both doctrines. The majority opinion concludes that "although a substantial economic presence standard is by nature more elastic than the bright-line physical presence test, we are convinced that when properly applied, a greater nexus is required under the substantial economic presence standard [than] under the minimum contacts analysis." *See* Majority opinion, p. 172, 640 S.E.2d p. 235.

Moreover, the dissenting opinion's lengthy discussion of the Due Process Clause is unwarranted and prone to create confusion. The application of the Due Process Clause is not the issue presented for resolution in this case nor does it play any role in the decision reached by the majority of the Court. The question that was brought for our review was, solely, "whether application of West Virginia's business franchise and corporation net income taxes to MBNA, a business with no physical presence in this state, violates the Commerce Clause of the United States Constitution." Majority opinion, p. 166, 640 S.E.2d p. 229 (footnote omitted). Significantly, as recognized by the majority opinion, the requirements for satisfying the Due Process Clause and the Commerce Clause are different. *See* Majority opinion, p. 168, 640 S.E.2d p. 231 ("In addressing this issue, the Supreme Court first indicated that in determin-

ing the propriety of a state use tax on an out-of-state corporation 'the nexus requirements of the Due Process and Commerce Clauses are not identical.'" (internal citation omitted)). The Due Process Clause is concerned with notions of fairness, while the Commerce Clause is aimed at the effects of state regulation on the national economy. Thus, the dissenter's analysis under the Due Process Clause is wholly irrelevant and inapplicable to the issue before the Court in this case.

The final point I wish to address is the dissent's unexplained and rigid adherence to a physical presence requirement for all types of taxes. The dissenting opinion argues that the taxing scheme at issue impermissibly burdens interstate commerce, yet it fails to explain how such an impermissible scheme occurs. *See* Syl. pt. 3, *Battle,* 150 W.Va. 37, 146 S.E.2d 686 ("A tax imposed pursuant to an act of the legislature of this state will not be held to contravene the commerce clause of Article I, Section 8 of the Constitution of the United States unless the imposition of the tax discriminates against or imposes an undue burden on interstate commerce. Such a tax will not be held to violate the commerce clause merely because it relates to or affects interstate commerce in some indirect, incidental and inconsequential manner."). When a company, whether out-of-state or in-state, earns millions of dollars [2] directly as a result of its dealings with West Virginia customers, should it not be compelled to pay taxes? [3] If not, then all companies would only deal with out-of-state customers so as to avoid all business franchise and corporation net income taxes. Such a result is perverse, especially when considering the climate of today's business world where new technology has made it possible for businesses to span the globe. I see no reason why a small "mom and pop" store in the State of West Virginia, with gross receipts in the thousands, should be compelled to pay business franchise and corporation net income taxes due to its physical presence in the State, while a large corporation, like MBNA, who makes millions of dol-

lars from West Virginia's economy, would be exempt from such taxes simply because it has no physical presence here. As the majority shrewdly points out, in today's world, a business does not necessarily need a physical presence anywhere. MBNA's significant economic presence in this State meets the substantial nexus standard; thus, it should not be exempt from state taxation.

Because the majority correctly addressed and resolved the issues in this case, I respectfully concur with the opinion of the Court.

---

**2.** *See* note 1, *supra.*

**3.** On its multimillion dollar gross profits, *see* note 1, *supra,* MBNA was required to pay, in 1998, a business franchise tax of $32,010.00 and a corpo-

ration net income tax of $168,034.00. In 1999, MBNA was required to pay a business franchise tax of $42,339.00 and a corporation net income tax of $220,897.00. *See* Majority opinion, p. 165, 640 S.E.2d p. 228.