# FILED

December 17, 1999

Cecil Crowson, Jr.
Appellate Court Clerk

## IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE

| | | |
|---|---|---|
| **J. C. PENNEY NATIONAL BANK,** | ) | |
| | ) | |
| | ) | |
| Plaintiff/Appellant, | ) | **Davidson Chancery No. 96-276-I** |
| | ) | |
| **VS.** | ) | **Appeal No. M1998-00497-COA-R3-CV** |
| | ) | |
| **RUTH E. JOHNSON, Commissioner** | ) | |
| **of Revenue, State of Tennessee,** | ) | |
| | ) | |
| | ) | |
| Defendant/Appellee. **)** | | |

APPEAL FROM THE CHANCERY COURT OF DAVIDSON COUNTY
AT NASHVILLE, TENNESSEE
THE HONORABLE ERNEST PELLEGRIN, SPECIAL CHANCELLOR

**MICHAEL D. SONTAG**
**BRYAN W. METCALF**
**BASS, BERRY & SIMS, PLC**
Nashville, Tennessee
Attorneys for Appellant

**PAUL G. SUMMERS**
**Attorney General & Reporter**
**MICHAEL E. MOORE**
**Solicitor General**
**JOE C. PEEL**
**Senior Counsel**
**Office of the Attorney General**
**Tax Division**
Nashville, Tennessee
Attorneys for Appellee

**JOSEPH W. GIBBS**

**REBECCA C. BLAIR**
**BOULT, CUMMINGS, CONNERS & BERRY, PLC**
Nashville, Tennessee
**DIANN L. SMITH**
**Committee on State Taxation**
Washington, D.C.
**JEFFREY A. FRIEDMAN**
**WILLIAM D. PELTZ**
**BOBBY L. BURGNER**
**Committee on State Taxation**
Washington, D.C.
Attorneys for *Amicus Curiae* Committee on State Taxation


**JOHN ROBERT JACOBSON**
**BOWEN, RILEY, WARNOCK & JACOBSON**
Nashville, Tennessee
**LINDA ARNSBARGER**
**PAUL H. FRANKEL**
**NEIL I. POMERANTZ**
**THOMAS H. STEELE**
**MORRIS & FOERSTER, LLP**
Washington, D.C.
Attorneys for *Amicus Curiae* VISA U.S.A. INC. and MASTERCARD INTERNATIONAL, INC.

**REVERSED AND DISMISSED**



**ALAN E. HIGHERS, J.**



**CONCUR:**

**DAVID R. FARMER, J.**

**HOLLY KIRBY LILLARD, J.**

The J.C. Penney National Bank appeals from the Chancery Court of Davidson County, which upheld the imposition of franchise and excise taxes against the Bank by the Tennessee Department of Revenue. For the reasons stated herein, we reverse the decision of the trial court.

## Facts and Procedural History

At all relevant times, the J.C. Penney National Bank[1] ("the National Bank" or "JCPNB") was a federally chartered national banking association incorporated under the laws of Delaware with its principal place of business and commercial domicile in Harrington, Delaware. Ruth E. Johnson ("Commissioner") was the Commissioner of Revenue for the State of Tennessee and was named in this case in her official capacity. The present appeal arises from the Commissioner's imposition of franchise and excise taxes against JCPNB on income allegedly generated by JCPNB's credit card activities in the State of Tennessee.

In order to clarify the positions of the respective parties, we find it necessary briefly to describe, perhaps to the point of oversimplification, the various entities and procedures involved in JCPNB's credit card business.

Through its Delaware offices, JCPNB offers consumer banking services such as deposit accounts, home mortgage lending, general consumer loans, and automated teller machine ("ATM") services. In addition to the normal banking services which it provides, JCPNB engages in credit card lending through the issuance of Visa and MasterCard credit cards.[2] JCPNB has been issuing Visa credit cards since 1983, and MasterCard credit cards since 1984.

JCPNB contracted with the J.C. Penney Company, its parent company, to perform various marketing and processing services that were necessary to create and maintain JCPNB's credit card business. Under that contract, the J.C. Penney Company agreed to provide services such as credit card solicitation, marketing, statement and payment processing, customer service, and collection. The J.C. Penny Company, in turn, contracted with other companies to provide many of these services.

The J.C. Penney Company contracted with Maryland Bank National Association (" MBNA"), an unrelated corporation domiciled in Texas, to provide the data processing related to the National Bank's credit card business. MBNA is a company that offers credit card processing services to a variety of banks. As transactions were received through the Visa or MasterCard network, MBNA posted them to the appropriate cardholder account. MBNA was also responsible for sending out account statements each month.

The J.C. Penney Company also contracted with Business Services, Inc. ("BSI"), a wholly owned subsidiary, to provide general marketing and payment processing services.[3]

After MBNA sent monthly statements to the cardholders, the cardholders would send their payments to a BSI payment processing center in San Antonio, Texas. Also, as part of its marketing responsibilities, BSI solicited credit card accounts on behalf of JCPNB. These solicitations were sent via U.S. Mail to potential customers throughout the United States, including Tennessee.[4] As the first step in the solicitation process, BSI obtained the names of possible customers. Some names were obtained from a list of people who had a prior credit history with the J.C. Penney Company. BSI also obtained potential customer names through the use of mailing lists from various credit bureaus.[5] BSI would then submit the list of potential cardholders to a national credit bureau who would select those people having a credit profile consistent with the criteria established by JCPNB. The selected people would then receive an offer to apply for a credit account with the National Bank.

None of the activities described above occurred in the State of Tennessee, other than the solicitations being mailed to Tennessee residents. Also, all of the entities involved in the National Bank's credit card operation were located outside the State of Tennessee.[6] JCPNB itself maintained no offices or places of business in Tennessee, nor did it have any employees in the State.

The Visa and MasterCard credit cards issued by the National Bank were "universal cards." This name derives from the fact that these cards could be used to purchase goods and services throughout the world from any retailer who displayed the Visa or MasterCard logo.[7] A credit card purchase may be made in two ways. The most common transaction occurs when the cardholder presents the card to a merchant and the merchant swipes the card through a point of sale terminal. The terminal reads the magnetic strip on the back of the card and transmits a request for authorization to the issuing bank. Another type of transaction can occur when the cardholder provides a merchant with his or her account number and expiration date, but does not physically present the card to the merchant. This

type of transaction generally occurs when purchases are being made over the telephone or, in today's world, via the internet. In either case, a sales slip is generated which the merchant submits to a merchant bank with whom the merchant has a contract.[8] The merchant bank will then remit the transaction amount to the merchant minus a discount. The merchant bank may be located inside or outside Tennessee.

The merchant bank records the information from the sales slip and transmits the information to a VISA (USA) Inc. or MasterCard International, Inc. interchange center for the purpose of obtaining payment of the face amount of the slip, less an interchange fee, from the bank that issued the credit card, which, in this case, was JCPNB. Visa and MasterCard regularly inform JCPNB of the amount owed by it with respect to sales slips which have been submitted by all merchant banks. From Delaware, the National Bank transfers funds to pay these amounts.

The J.C. Penney National Bank charged an annual fee on most Visa and MasterCard credit card accounts, as well as interest and other fees in connection with the account. The National Bank then paid an income tax to the State of Delaware based upon 100% of the National Bank's net income. JCPNB had never filed a franchise or excise tax return with the Tennessee Department of Revenue, nor had it ever paid any franchise or excise taxes to the State of Tennessee. However, the Field Audit Division of the Tennessee Department of Revenue audited JCPNB in 1995 for the period of February 1990 through January 1994. On November 1, 1995, the Department of Revenue issued an assessment to the National Bank in the amount of $178,314, which included: $111,725 in franchise and excise taxes, $27,932 in penalties, and $38,657 in interest. The assessment was based on the determination that JCPNB was a "financial institution" as defined in T.C.A. § 67-4-804(a)(8) and was subject to franchise and excise taxation under T.C.A. §§ 67-4-806 and 67-4-903. In calculating the taxes, the Department of Revenue applied the single-factor,

gross receipts apportionment formula applicable to financial institutions found in T.C.A. §§ 67-4-815 and 67-4-919.

In accordance with T.C.A. § 67-1-1801, the National Bank filed this action contesting the assessment of the franchise and excise taxes on three grounds: (1) the assessment violated the Commerce Clause of the United States Constitution; (2) the assessment violated the Due Process Clause of the United States Constitution; and (3) basing the assessment upon the single receipts factor apportionment formula violated the Due Process Clause of the United States Constitution. The case was tried in the Chancery Court of Davidson County on February 9 and 10, 1998. The chancellor issued a memorandum opinion on October 16, 1998 upholding the assessment. The chancellor concluded that the assessment was not violative of the requirements of the Due Process Clause of the United States Constitution, and a sufficient nexus existed between the State of Tennessee and JCPNB to satisfy the requirements of the Commerce Clause. The Commissioner filed a motion to alter or amend the order because it did not provide for a judgment against JCPNB for the disputed tax liability and did not provide for an award of attorney's fees and expenses pursuant to T.C.A. § 67-1-1803(d). The chancellor entered a final order on December 7, 1998, awarding judgment in favor of the Commissioner in the amount of $178,314, as well as awarding attorney's fees and expenses to the Commissioner as the prevailing party. This appeal followed.

On appeal, JCPNB presents a single question for review. That question is whether JCPNB's relationship with the State of Tennessee satisfies the "substantial nexus" requirement of the Commerce Clause.

**Law and Analysis**

———

Financial institutions "doing business" in the State of Tennessee are subject to excise and franchise taxes pursuant to T.C.A. §§ 67-4-806(d)(2)[9] and 67-4-903(f)(2)[10]. The Commissioner contends that JCPNB's credit card activities come within the terms of the statutory provisions because JCPNB: (1) regularly solicits business from customers in Tennessee; (2) provides credit card services to its customers; (3) engages in transactions in which it extends credit to these customers; and (4) receives interest income and fee income from these transactions and loans. Appellee's Brief at p. 10. JCPNB, however, does not challenge the statutes pursuant to which the taxes were imposed. Rather, JCPNB contends that its contacts with the State of Tennessee, even if sufficient under the Tennessee statutory scheme, do not provide a sufficient nexus under the Commerce Clause of the United States Constitution to uphold the assessment.

## I.

This case presents a question regarding the limits of Tennessee's power to tax out-of-state sellers. Constitutional limitations on this power are found in both the Due Process Clause of the Fourteenth Amendment and the Commerce Clause of article 1, § 8. In the trial court, JCPNB challenged the franchise and excise taxes as a violation of both constitutional provisions. On this appeal, JCPNB has limited its question presented to consideration of whether the taxes imposed by the State of Tennessee violates the Commerce Clause. However, JCPNB also claims that the Commissioner has "blurred the line" between Due Process and Commerce Clause analysis.

Some of the Commissioner's arguments do, in fact, confuse the analysis between the Commerce Clause and the Due Process Clause. For example, in arguing that JCPNB has a substantial nexus with the State of Tennessee, the Appellee's brief states: "[JCPNB] is exercising the substantial privilege of doing business in Tennessee. On this basis,

sufficient nexus exists and JCPNB is receiving the protections which establish a basis for finding of nexus." The Commissioner makes this statement after quoting a passage from Mobil Oil Corp. v. Commissioner of Taxes of Vermont, 445 U.S. 425, 100 S.Ct. 1223, 63 L.Ed.2d 510 (1980).[11] However, the phrase "substantial privilege of doing business" is traditionally used in the area of due process. Additionally, the Mobil Oil case specifically used the language which Appellee quotes in the context of a Due Process analysis.[12] Therefore, recognizing the confusion that may exist between the parties, we find it necessary to clarify the specific limitations imposed by both Due Process and the Commerce Clause.

In Quill Corp. v. North Dakota, the United States Supreme Court considered the constitutional limitations on a state's power to tax imposed by both the Due Process Clause and the Commerce Clause. 504 U.S. 298, 112 S.Ct. 1904, 119 L.Ed.2d 91 (1992). The Court began by noting that the "two claims are closely related." Id. (quoting National Bellas Hess, Inc. v. Department of Revenue of Ill., 386 U.S. 753, 87 S.Ct. 1389, 18 L.Ed.2d 505 (1967)). However, the Court also pointed out that the two Clauses each pose distinct limits on the taxing power of the States. Quill, 504 U.S. at 305. Therefore, a State's power to tax may be sustained under the Due Process Clause, but imposition of the tax may nonetheless violate the Commerce Clause.[13] Id. (citing Tyler Pipe Indus., Inc. v. Washington State Dept. of Revenue, 483 U.S. 232, 107 S.Ct. 2810, 97 L.Ed.2d 199 (1987)).

## II.

The due process analysis in the area of state taxation of interstate commerce derives from the rules for *in personam* jurisdiction expressed in International Shoe Co. v. Washington, and its progeny. 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). International Shoe, the seminal case in the modern due process era, allows a state to assert personal

jurisdiction if the defendant has minimum contacts with the jurisdiction "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" International Shoe, 326 U.S. at 316 (quoting Milliken v. Meyer, 311 U.S. 457, 463, 61 S.Ct. 339, 343, 85 L.Ed. 278 (1940)).  Subsequent cases made clear the point that physical presence in the jurisdiction is not necessary for "minimum contacts" to exist.  See, e.g., Burger King Corp. v. Rudzewicz, 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985).

In the context of state taxation, the Due Process Clause "requires some definite link, some minimum connection, between a state and the person, property or transaction it seeks to tax."  Quill, 504 U.S. at 306 (quoting Miller Brothers Co. v. Maryland, 347 U.S. 340, 344-345, 74 S.Ct. 535, 539, 98 L.Ed. 744 (1954)).  Prior to the 1967 decision in National Bellas Hess, Inc. v. Department of Revenue. of Ill., 386 U.S. 753, 87 S.Ct. 1389, 18 L.Ed.2d 505 (1967), the Supreme Court had found that "definite link" to exist in several cases involving state use taxes.  However, the taxpayer in all those cases had some type of physical presence in the taxing state.  Quill 504 U.S. at 306.  The Quill Court noted that the Bellas Hess decision suggested that physical presence in the State was *necessary* to sustain jurisdiction under the Due Process Clause.  See Quill 504 U.S. at 306-307. Applying the reasoning from the International Shoe and Burger King decisions, the Quill court rejected the notion that due process mandated the physical presence of an out-of-state seller before a state could tax that seller.  The Court held that the Due Process Clause does not operate to bar enforcement of a use tax against a mail-order house "that is engaged in continuous and widespread solicitation of business within a state."  Quill, 504 U.S. at 308.  In other words, if the contacts were sufficient to subject the corporation to personal jurisdiction in the forum state, then imposition of a use tax on the corporation's business in the state would be sustained in the face of a Due Process challenge.  Physical presence in the state is not necessary.  In so holding, the Quill Court noted the policy

concerns that drive due process analysis. Specifically, the Court stated:

> Due process centrally concerns the fundamental fairness of governmental activity. Thus, at the most general level, the due process nexus analysis requires that we ask whether an individual's connections with a State are substantial enough to legitimate the State's exercise of power over him. We have, therefore, often identified "notice" or "fair warning" as the analytic touchstone of due process nexus analysis.

Quill, 504 U.S. at 312.

In the present case, the National Bank's relationship with the State of Tennessee was such that the imposition of the franchise and excise taxes was not precluded by due process considerations. The lack of a physical presence in Tennessee does not mandate a finding to the contrary. The following passage from Burger King Corp. v. Rudzewicz, cited by the Quill Court, is equally applicable in the present case:

> Jurisdiction in these circumstances may not be avoided merely because the defendant did not physically enter the forum State. Although territorial presence frequently will enhance a potential defendant's affiliation with a State and reinforce the reasonable foreseeability of suit there, it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted. So long as a commercial actor's efforts are 'purposefully directed' toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there.

Burger King, 471 U.S. at 476. JCPNB has reached out to the citizens of the State of Tennessee through the solicitations for credit cards that were sent on its behalf. Moreover, JCPNB has purposefully availed itself of the substantial privilege of doing business in the State of Tennessee. See id. Clearly, the franchise and excise taxes assessed against JCPNB are not violative of the rights guaranteed under the Due Process Clause.

The Due Process Clause, however, is only the first consideration in determining whether a state may tax an out-of-state seller. Having recognized that the Due Process

Clause does not preclude imposition of the franchise and excise taxes on JCPNB, we must consider the limitations imposed by the Commerce Clause.

III.

The Commerce Clause expressly authorizes Congress to "regulate Commerce with foreign Nations, and among the several States." U.S. Const. art. I, § 8, cl. 3. In addition to this affirmative grant of power, the "negative" or "dormant" Commerce Clause also serves to prohibit state actions that interfere with interstate commerce. See Quill, 504 U.S. at 309 (citing South Carolina State Highway Dept. v. Barnwell Bros., Inc. 303 U.S. 177, 185, 58 S.Ct. 510, 514, 82 L.Ed. 734 (1938)). Simply stated, the fact that the Commerce Clause grants Congress the specific power to regulate interstate commerce necessarily carries the negative implication that the states may not act to interfere with interstate commerce.

The earliest cases in this area strictly limited the state's rights to tax interstate sales. See, e.g., Leloup v. Port of Mobile, 127 U.S. 640, 648, 8 S.Ct. 1380, 1384, 32 L.Ed. 311 (1888)("no state has the right to lay a tax on interstate commerce in any form"). Subsequent decisions by the Court moved away from the absolute limits imposed on state taxation and began to distinguish between "direct" and "indirect" burdens on interstate commerce. This line of cases culminated with the decision in Freeman v. Hewit, 329 U.S. 249, 67 S.Ct. 274, 91 L.Ed.265 (1946), in which the Court formally embraced the distinction and struck down an Indiana tax as a direct tax on interstate sales.

Dormant Commerce Clause jurisprudence in the area of state taxation changed dramatically with the decision in Complete Auto Transit, Inc. v. Brady, 430 U.S. 274, 97

S.Ct. 1076, 51 L.Ed.2d 326 (1977). The Complete Auto decision rejected the line of cases which had held impermissible the direct taxation of interstate commerce by the states.[14] Complete Auto enunciated a four-part test, which provided that a state tax on an out-of-state seller will be sustained so long as the "tax (1) is applied to an activity with a substantial nexus with the taxing state, (2) is fairly apportioned, (3) does not discriminate against interstate commerce, and (4) is fairly related to the services provided by the state." Complete Auto Transit, Inc. 430 U.S. at 279.

The question in the present case is whether JCPNB's relationship with the State of Tennessee satisfies the "substantial nexus" requirement found in the first prong of the Complete Auto test. That question, in turn, raises the question of what is meant by the term "substantial nexus." As an initial matter, we can say that substantial nexus under the Commerce Clause is not the same as minimum contacts under the Due Process Clause. See Quill, 504 U.S. at 313 ("Thus, the 'substantial nexus' requirement is not, like due process' 'minimum contacts' requirement, a proxy for notice, but rather a means for limiting state burdens on interstate commerce"). Although stating that proposition in the abstract seems to be simple enough, the actual analysis can be much more confusing. The problem is that phrases such as "minimum contacts" and "substantial nexus" do not really mean anything. There is no definitive line that marks a minimum contact, nor is there a specific point at which a substantial nexus exists. The analysis in this area is necessarily done on a case-by-case basis. However, we are guided by the recognition that the Commerce Clause imposes a greater limitation on Tennessee's right to tax JCPNB than does the Due Process Clause. With the distinctions between the two clauses in mind, we turn to the question of whether a substantial nexus exists to sustain the franchise and excise taxes imposed by the Commissioner.

**IV.**

We do not consider the fact that JCPNB was "doing business" in Tennessee to be dispositive of the present issue. If that were the case, we would have obliterated the distinction between the Due Process Clause and the Commerce Clause. Instead, we must attempt to delineate that level of "presence" in the State of Tennessee that will justify the imposition of the types of taxes that are the subject of this appeal. This "presence" must, in order to satisfy the Commerce Clause, be more than merely "doing business" in the State of Tennessee. JCPNB relies on Bellas Hess and Quill to argue that physical presence is required. The Commissioner, on the other hand, argues that physical presence is not a formal requirement and the validity of a state tax should be determined under the Complete Auto test. The Commissioner refers to this as "contemporary Commerce Clause jurisprudence." The fundamental flaw in the Commissioner's argument is that Complete Auto does not set a different standard than that contemplated in Bellas Hess and Quill. Rather, Bellas Hess and Quill specifically address the first prong, or the substantial nexus requirement, of the Complete Auto test. See Quill, 504 U.S. 311. In that regard, the Bellas Hess/Quill decisions are entirely consistent with the Complete Auto test. Both Bellas Hess and Quill are clear in their holding that in the context of a use tax, physical presence is required in order to satisfy the substantial nexus requirement of Complete Auto.

The only real issue is whether there is any reason to distinguish the present case from Bellas Hess and Quill. The Commissioner argues that those cases are distinguishable because they involved use taxes, whereas the present case involves franchise and excise taxes. We must reject the Commissioner's argument. While it is true that the Bellas Hess and Quill decisions focused on use taxes, we find no basis for concluding that the analysis should be different in the present case. In fact, the Commissioner is unable to provide any authority as to why the analysis should be different for franchise and excise taxes.[15] It is certainly true that the Quill Court expressed some reservations about the vitality of the Bellas

Hess decision. See Quill, 504 U.S. at 311 (stating that the Bellas Hess decision might be different were the issue to arise for the first time today). However, we are not in a position to speculate as to how the Supreme Court might decide future cases. We are only able to rely on past decisions. Any constitutional distinctions between the franchise and excise taxes presented here and the use taxes contemplated in Bellas Hess and Quill are not within the purview of this court to discern. As such, we feel that the outcome of this case is governed by Bellas Hess and Quill, as those decisions interpret the first prong of the Complete Auto test.

JCPNB argues that the present case is "almost identical" to the facts in Quill. In many respects, that assertion is correct. JCPNB is a Delaware corporation with no offices or agents in Tennessee, just as the taxpayer in Quill had no offices or employees in North Dakota. See Quill, 504 U.S. at 302. Also, JCPNB did not physically engage in any activities in Tennessee connected with its credit card business. Similarly, Quill solicited business in North Dakota through catalogs, flyers, and other advertisements and delivered those goods via mail or common-carrier, thereby having no physical presence in North Dakota. Id.

In response to JCPNB, the Commissioner asserts several arguments in support of finding that JCPNB does, in fact, have a substantial nexus with Tennessee. First, she argues that the credit cards which JCPNB issued were tangible physical property over which JCPNB maintained ownership, thereby giving JCPNB a physical presence in Tennessee through those cards.[16] Additionally, she argues that the presence of the J.C. Penney retail stores in Tennessee provides the requisite substantial nexus. We will deal with each of these arguments in turn.

During the tax years in question, JCPNB had between 11,000 and 17,000 accounts with Tennessee residents. The chancellor found that the actual credit cards constituted "

tangible property for substantial nexus purposes." In reaching that decision, the chancellor found it persuasive that the cards remained the property of JCPNB. While we agree that a credit card is tangible in that it can be seen and touched, we do not agree that the presence of the credit cards in Tennessee is constitutionally significant. Additionally, we do not find it relevant that JCPNB retained ownership of the cards.

Credit cards, in and of themselves, are virtually worthless. The "value" of these cards is found in the right which the card represents, namely the credit account. The card is merely representative of the customer's right to charge goods and services. The actual card is not even necessary to the transaction.[17] It merely serves as a convenient article on which to record the necessary information regarding the customer's account. As the chancellor correctly determined, the real asset is the intangible account which the card represents. Those accounts were located, for tax purposes, in the State of Delaware and not subject to a Tennessee tax. Therefore, we do not agree with the chancellor's determination that the physical presence of the JCPNB credit cards constituted a basis for finding substantial nexus.[18]

The Commissioner also argues that JCPNB had a physical presence in Tennessee by virtue of the fact the J.C. Penney Company, JCPNB's parent, owned and operated the J.C. Penney retail stores in Tennessee. This argument lacks merit because the retail stores were not affiliated with JCPNB's Visa and MasterCard credit card operations.[19] The retail stores conducted no activities which assisted JCPNB in maintaining its credit card business in Tennessee. The record shows that one could not apply for the JCPNB credit cards at the J.C. Penney retail stores, nor could individuals make a payment on their Visa or MasterCard account at the retail stores. Therefore, we reject the Commissioner's arguments which contend that a substantial nexus exists based on the presence of the J.C. Penney retail stores in Tennessee.

Finally, the chancellor concluded that a substantial nexus existed based on "the activities of the affiliates and third parties working on JCPNB's behalf." In reaching this conclusion, the chancellor relied on Tyler Pipe Indus. v. Washington State Dep't of Rev., 483 U.S. 232, 107 S.Ct. 2810, 97 L.Ed.2d 199 (1987) and Scripto v. Carson, 362 U.S. 207, 80 S.Ct. 619, 4 L.Ed. 2d 660 (1960). We are unable to agree with the chancellor's reasoning. Both Tyler Pipe and Scripto involved one crucial element which is absent in the present case. In those cases, activities were being conducted in the taxing state that substantially contributed to the taxpayer's ability to maintain operations in the taxing state. Simply put, the taxpayer in those cases had a physical presence in the taxing state that is lacking in the present case.

In Scripto, the Georgia taxpayer employed independent contractors who solicited business in the State of Florida, the taxing state. See Scripto, 362 U.S. at 211 ("Each salesman . . . is actively engaged in Florida as a representative of Scripto for the purpose of attracting, soliciting and obtaining Florida customers"). The real issue in Scripto was whether it made any constitutional difference that the individuals hired to solicit business were employed as "independent contractors" rather than as regular employees. The court refused to find any meaningful difference between the labels used to describe the employees. See id. at 211 (holding the distinction between regular employees and independent contractors to be without constitutional significance).

Similarly, in Tyler Pipe, the Supreme Court found that a substantial nexus existed to justify the imposition of a business and occupation tax by the State of Washington.[20] In Tyler, the solicitation was "directed by executives who maintain their offices out-of-state and by an *independent contractor located in Seattle*." Tyler Pipe, 483 U.S. at 249 (emphasis added). The Court, agreeing with the Washington Supreme Court, found the crucial factor to be the

fact that the activities which allowed the taxpayer to establish and maintain a market actually took place *in the State of Washington*. Id. at 250 (emphasis added). The Court concluded by stating, "the activities of Tyler's sales representatives adequately support the State's jurisdiction to impose its wholesale tax on Tyler." Id. at 251. Here, as in Scripto, the distinguishing factor was the physical presence of the taxpayer in the taxing state.

A review of the facts of the present case convinces this court that JCPNB did not have a physical presence in Tennessee through its affiliates. Neither BSI nor MBNA actually performed any services on behalf of JCPNB in the State of Tennessee. The solicitation, which was the most important function in allowing JCPNB to maintain its business, took place through the U.S. Mail, which, under the holding in Quill, does not allow a finding of substantial nexus. In short, the activities which allowed JCPNB to conduct its credit card operation did not occur in the State of Tennessee.[21] As such, we believe the chancellor's reliance on Scripto and Tyler Pipe was misplaced as those cases are clearly distinguishable.

It is not our purpose to decide whether "physical presence" is required under the Commerce Clause. However, the Commissioner has pointed to no case in which the Supreme Court of the United States has upheld a state tax where the out-of-state taxpayer had absolutely no physical presence in the taxing state. The Commerce Clause requires a greater relationship than does the Due Process Clause. If we were to uphold the tax assessment against JCPNB, we believe that we would be unjustifiably overlapping the two clauses. While we are confident that the tax assessment satisfies due process, we fail to see the substantial nexus necessary to sustain the tax under the Commerce Clause. Scripto, Inc. v. Carson, is, by the Supreme Court's own words, the furthest extension of a state's right to tax an out-of-state seller. However, Scripto involved facts that are not present in this case. Specifically, the Georgia company in Scripto employed individuals in the State

of Florida, the taxing state, to solicit business. Therefore, if <u>Scripto</u> is the furthest reach of a state's power to tax, and there is even less of a relationship in this case than was present in <u>Scripto</u>, we conclude that a substantial nexus is lacking to uphold the tax assessment against JCPNB.

## **<u>Conclusion</u>**

For the reasons stated herein, we reverse and dismiss the decision of the trial court, which upheld the imposition of franchise and excise taxes against JCPNB. Costs of this appeal are taxed to the appellee, Ruth E. Johnson, Commissioner of Revenue, State of Tennessee, for which execution may issue if necessary.

HIGHERS, J.

CONCUR:

FARMER, J.

LILLARD, J.