

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-22-00388-CV

_____

JOSEPH D. STEWART, EXECUTOR OF THE ESTATE OF HELEN LOUISE
STEWART, DECEASED, Appellant

V.

CIVITAS SENIOR HEALTHCARE, LLC D/B/A CIVITAS SENIOR LIVING;
ELITE MOBILE DENTAL, INC.; DR. MARGARET SHAW, DDS;
DR. MICHAEL LUNARDON, DDS; AND DR. DANICE COUCH, DDS,
Appellees

On Appeal from the 393rd District Court
Denton County, Texas
Trial Court No. 22-3267-393

Before Sudderth, C.J.; Kerr and Womack, JJ.
Memorandum Opinion by Chief Justice Sudderth

## MEMORANDUM OPINION

Appellant Joseph D. Stewart, Executor of the Estate of Helen Louise Stewart (Executor), challenges the trial court's preliminary determinations that seven of his claims are health care liability claims (HCLCs). *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 51.014(a)(15), 74.353(a), (d). Although the statute providing for these preliminary HCLC determinations is relatively new,[1] the HCLC determination itself is not, and Executor's claims fall squarely within the established bounds of HCLCs. *See id.* § 74.001(a)(13) (defining "[h]ealth care liability claim"). Therefore, we will affirm.

## I. Background

Decedent Helen Louise Stewart, Executor's grandmother, suffered from dementia in the final years of her life and lived at an assisted-living facility operated by Appellee Civitas Senior Healthcare, LLC. Executor alleges that Civitas failed to adequately care for Decedent while she was living at the facility.

According to Executor, Civitas promised, among other things, that Decedent "would be under the constant care of a qualified physician," "would receive all necessary medical treatment and attention," would receive three nutritious meals per day, and "would be regularly monitored for changes in health and condition."

---

[1]Section 74.353 of the Texas Civil Practice and Remedies Code provides that, "[o]n motion of a claimant . . . , a [trial] court may issue a preliminary determination regarding whether a claim made by the claimant is a health care liability claim." Tex. Civ. Prac. & Rem. Code Ann. § 74.353(a). This section took effect on September 1, 2021. Act of May 13, 2021, 87th Leg., R.S., S.B. 232, § 5 (eff. Sept. 1, 2021).

2

Executor claims that these promises were false and that Civitas not only fraudulently induced Decedent to move into the facility based on these false promises but also breached the express warranties created by these promises and breached the corresponding contractual commitments in Civitas's Residency Agreement.[2]

Moreover, while Decedent was living at Civitas's facility, a mobile dental company—Appellee Elite Mobile Dental, Inc., working through Drs. Margaret Shaw, Danice Couch, and Michael Lunardon (collectively, Elite)—performed what Executor describes as "unnecessary" dental procedures on Decedent. In one such procedure, Elite extracted five of Decedent's teeth. Executor accuses Civitas and Elite of conspiring to profit from such dental procedures;[3] he claims that the procedures were not medically necessary and were performed without Decedent's consent.[4] He pleaded claims against Elite for committing (1) fraud by misrepresenting the medical necessity of the dental procedures, (2) assault by performing the unnecessary tooth

---

[2]Executor alleges that Decedent executed a power of attorney giving her son full authority over her affairs and that her son signed the Residency Agreement on her behalf. His Original Petition also includes a claim for negligent hiring, supervision, and training, but Executor's Second Amended Petition omits this claim.

[3]Executor's Original Petition alleges that all defendants aided or abetted one another's misdeeds and are therefore jointly and severally liable for Executor's damages. Executor's Original Petition also asserts a wrongful death claim against Civitas and Elite, but the claim was omitted from Executor's Second Amended Petition.

[4]Executor also alleges that Decedent's son, who had the authority to manage her affairs under power of attorney, did not consent to the dental procedures.

extractions, and (3) intentional infliction of emotional distress (IIED) for the same reason.[5]

Executor moved for preliminary determinations as to whether the causes of action in his Original Petition—including the seven described above and at issue in this appeal—were HCLCs. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.353(a). Executor argued that they were not, claiming that "the purpose of the [Medical Liability Act] is to cap noneconomic damages in medical malpractice suits sounding in negligence, not in fraud." Executor elaborated on this argument in a non-evidentiary hearing on his motion. Emphasizing "fundamental fairness" and legislative intent, Executor contended that the Medical Liability Act "was meant to protect negligent behavior wh[ile] the[ defendants] were engaged in . . . egregious conduct." Although he conceded that "medical expert testimony will likely be necessary at some stage of this litigation," he argued that the "need for expert testimony does not determine [the] nature of [the] claim," i.e., whether it is an HCLC. [Capitalization altered.]

The trial court concluded that all of the causes of action in Executor's Original Petition—which then numbered twelve—qualified as HCLCs. Executor subsequently amended his petition to drop five of his twelve claims.[6] He challenges the trial court's

[5]Executor's Original Petition asserts premises liability and negligent activity causes of action against Civitas as well as a breach of express warranty cause of action against Elite. These claims were removed from Executor's Second Amended Petition.

[6]After the trial court issued its appealed-from interlocutory order, Executor filed a First Amended Petition, in which he added another defendant: CSH Flower

4

HCLC determinations for the seven causes of action that survived amendment: Civitas's fraud, breach of express warranty, and breach of contract; Elite's fraud, assault, and IIED; and both entities' conspiracy.[7]  *See id.* § 74.353(d).

## II.  Governing Law and Standard of Review

When a claim qualifies as an HCLC under the Medical Liability Act, the claim is subject to certain statutory requirements and restrictions, including a requirement that the plaintiff serve the defendant with an expert report within a certain amount of time.  *See id.* § 74.351.  Consequently, the Texas Legislature has authorized a trial court to, upon the plaintiff's request, "issue a preliminary determination regarding whether a

Mound Licensee, LLC.  Whereas Executor's Original Petition alleges that Civitas was doing business as The Oaks at Flower Mound, his First Amended Petition alleges that CSH was doing business as The Oaks at Flower Mound but that Civitas "operated and managed" The Oaks.  Executor alleges that CSH acted "by and through its agent Civitas" while Decedent lived at the facility.  [Capitalization altered.]

Later, Executor filed a Second Amended Petition, dropping five of the claims in his Original Petition:  his claims against Civitas for negligent hiring, supervision and training; for premises liability; and for negligent activity; his claim against Elite for breach of warranty; and his claim against both Civitas and Elite for wrongful death. One day before this appeal was set for submission, Executor filed a reply brief highlighting some of the changes to his petition and narrowing the scope of his appeal to the seven claims that survived amendment.  Accordingly, we do not address the HCLC status of the five claims dropped from Executor's Second Amended Petition.

[7]Executor's Second Amended Petition not only dropped five claims but also added four new claims:  a fraud (and declaratory judgment) claim against Elite, and in the alternative, claims against Elite for (1) breach of contract (2) negligence per se, and (3) negligence.  Executor urges this court to "consider" his Second Amended Petition and argues that his new fraud claim is not an HCLC.  But as Executor acknowledges, the trial court did not make a preliminary HCLC determination of this new claim, so it is not within the scope of this appeal.

5

claim made by the claimant is a health care liability claim for the purposes of [the expert-report requirement]." *Id.* § 74.353(a).

An HCLC is a "cause of action [(1)] against a health care provider[8] or physician [(2)] for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care,[9] or safety or professional or administrative services directly related to health care, [(3)] which proximately results in injury to or death of a claimant, whether the claimant's claim or cause of action sounds in tort or contract." *Id.* § 74.001(a)(13); *see T.C. v. Kayass*, 535 S.W.3d 169, 172 (Tex. App.—Fort Worth 2017, no pet.). Executor's appeal focuses on the second element: whether Executor's claims are "for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care." Tex. Civ. Prac. & Rem. Code Ann. § 74.001(a)(13).

When analyzing this second element, we focus on "the facts underlying the claim, not the form of, or artfully[ ]phrased language in, the plaintiff's pleadings describing the facts or legal theories asserted." *T.C.*, 535 S.W.3d at 173; *see Baylor Scott*

---

[8]A "dentist" is a "health care provider," as is "a health care institution" such as "an assisted living facility." Tex. Civ. Prac. & Rem. Code Ann. § 74.001(a)(11)(B), (a)(12)(A)(ii), (a)(12)(A)(vii).

[9]"Health care" is defined as "any act or treatment performed or furnished, or that should have been performed or furnished, by any health care provider for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement." *Id.* § 74.001(a)(10).

6

*& White, Hillcrest Med. Ctr. v. Weems*, 575 S.W.3d 357, 363 (Tex. 2019) (noting that "we consider the underlying nature of the plaintiff's claim rather than its label" as "a party cannot avoid [the Medical Liability Act's] requirements and limitations through artful pleading"). Whether a claim qualifies as an HCLC turns on its "underlying nature," "essence," or "gravamen." *Baylor Scott & White*, 575 S.W.3d at 363–64; *Omaha Healthcare Ctr., LLC v. Johnson*, 344 S.W.3d 392, 394 (Tex. 2011); *Yamada v. Friend*, 335 S.W.3d 192, 197 (Tex. 2010); *Diversicare Gen. Partner, Inc. v. Rubio*, 185 S.W.3d 842, 851 (Tex. 2005).

"We also consider whether expert testimony is necessary to show breach of an applicable standard of care, whether the alleged act involves medical judgment related to the patient's care or treatment, and whether a specialized standard in the healthcare community applies." *Drs. Calabria-Ellis, P.C. v. Ho*, No. 02-16-00424-CV, 2017 WL 3821872, at *3 (Tex. App.—Fort Worth Aug. 31, 2017, no pet.) (mem. op.). Not all HCLCs require expert testimony, but "if expert medical or health care testimony is necessary to prove or refute the merits of the claim against a physician or health care provider, the claim is a health care liability claim." *Tex. W. Oaks Hosp., LP v. Williams*, 371 S.W.3d 171, 182 (Tex. 2012).

When a claim is asserted against a health care provider and is based on facts implicating the provider's conduct during the course of the patient's care, treatment, or confinement, a rebuttable presumption arises that the claim qualifies as an HCLC. *Baylor Scott & White*, 575 S.W.3d at 363; *Loaisiga v. Cerda*, 379 S.W.3d 248, 256 (Tex.

7

2012). Executor has conceded that this presumption applies here.[10] He thus bore the

burden to rebut the presumption with evidence that his claims were not HCLCs. *See*

*Baylor Scott & White*, 575 S.W.3d at 363.

Whether a cause of action qualifies as an HCLC is a question of law, so we

review de novo the trial court's findings that Executor's seven claims are "for

treatment, lack of treatment, or other claimed departure from accepted standards of

medical care, or health care, or safety or professional or administrative services

directly related to health care." Tex. Civ. Prac. & Rem. Code Ann. § 74.001(a)(13);

*Baylor Scott & White*, 575 S.W.3d at 363.

### III. Discussion

On appeal, Executor argues that his seven claims are not HCLCs because

(1) Decedent lacked the capacity to form the physician–patient relationship due to her

dementia and (2) Executor's causes of action do not concern Civitas's and Elite's

"treatment, lack of treatment, or other claimed departure from accepted standards of

medical care, or health care, or safety or professional or administrative services

directly related to health care." Tex. Civ. Prac. & Rem. Code Ann. § 74.001(a)(13).

---

[10]Executor attempts to walk back this concession in his reply brief; he claims that his concession was not binding because it was not a judicial admission. To the extent that Executor attempts to raise a new issue in his reply brief, he has waived it. *See* Tex. R. App. P. 38.3; *Hollis v. Acclaim Physician Grp., Inc.*, No. 02-19-00062-CV, 2019 WL 3334617, at *5 (Tex. App.—Fort Worth July 25, 2019, no pet.) (per curiam) (mem. op.).

## A. Lack of Capacity

Executor did not preserve his argument that Decedent lacked the capacity to form the physician–patient relationship. *See* Tex. R. App. P. 33.1(a)(1); *Ctr. for Neurological Disorders, P.A. v. George*, 261 S.W.3d 285, 295 (Tex. App.—Fort Worth 2008, pet. denied) (op. on remand) (reiterating, in appeal from trial court's denial of motions to dismiss HCLCs, that "[a]n appellate court cannot reverse based on a complaint not raised in the trial court"). Not only did Executor fail to raise this issue below,[11] but his written motion seeking the preliminary HCLC determinations acknowledged that his claims are "brought by a patient against a physician or health care provider." We overrule this portion of Executor's challenges to the seven HCLC determinations.

## B. Treatment, Lack of Treatment, or Departure from the Standard of Care

Executor's second argument—that his claims do not concern treatment, lack of treatment, or a departure from the standard of health care—fails on the merits. The factual allegations underlying each of Executor's claims recount allegedly unnecessary "treatment," a "lack of [necessary] treatment," and other claimed "departure[s] from

---

[11]In his reply brief, Executor attempts to frame his challenge to Decedent's capacity as a matter of statutory interpretation, which he argues can be raised for the first time on appeal. But even if Executor could avoid the preservation requirements by recasting his argument in his reply brief, *cf.* Tex. R. App. P. 38.3, his challenge to Decedent's capacity does not turn on differing interpretations of an unspecified statutory phrase.

9

[the] accepted standards of . . . health care." Tex. Civ. Prac. & Rem. Code Ann. § 74.001(a)(13).

## 1. Claims against Civitas

The gravamen of Executor's claims against Civitas is that Civitas provided sub-par assisted-living services—that it failed to adequately monitor Decedent's health, failed to provide her with necessary medical assistance, and allowed Elite to subject her to unnecessary dental procedures.

### a. Civitas's Fraud and Breach of Warranty

Executor pleaded fraud and breach of express warranty claims against Civitas based on Civitas's allegedly false representations that, among other things:

- "Decedent would receive all necessary medical treatment and attention";

- "Decedent would be under the constant care of a qualified physician";

- "Decedent would be provided three nutritional, well-balanced meals each day" consistent with "a large body of peer-reviewed research [that] exists relating to the effect of diet on cognition";[12]

- "Decedent would receive housekeeping services and her living area would be kept clean";

- "Decedent would be regularly monitored for changes in health and condition, and a care plan would be developed and modified based on those observations"; and

---

[12]Executor's Second Amended Petition removes the reference to the "large body of peer-reviewed research [that] exists relating to the effect of diet on cognition."

10

- Civitas would employ "skilled caregivers properly trained to care for individuals suffering from dementia and other forms of memory loss and cognitive impairment related to advanced age."

In essence, then, Executor alleges that Civitas failed to provide the medical treatments and related assisted-living services—including monitoring, meal provision, and housekeeping—that were necessary for dementia patients such as Decedent. Claims based on such allegations qualify as HCLCs. *See id.*

As an initial matter, Executor's own pleadings state that his claims are based on "Decedent['s failure to] receive all necessary medical treatment," and the Medical Liability Act categorizes a "cause of action . . . for treatment[ or] lack of treatment" as an HCLC. *Id.* Executor offers no coherent rationale for disputing this straightforward application of the Medical Liability Act's plain language.

But more importantly, the gravamen of Executor's claims is not just that Civitas failed to provide treatment but that this failure—and Civitas's related failures—departed from the accepted standards of assisted-living care. *See id.* How is the factfinder to determine what "medical treatment" was "necessary" or unnecessary, what changes in Decedent's "health and condition" required "monitor[ing]" and "modif[ications]" to her care plan, and what level of "skill[]" and "train[ing]" was required "to care for individuals suffering from dementia," if not by referencing the specialized standards of care for assisted-living facilities? *See Gomez v. Matey*, 55 S.W.3d 732, 735 (Tex. App.—Corpus Christi–Edinburg 2001, no pet.) (holding under predecessor statute that claims against physician for "perform[ing] an unnecessary

11

hysterectomy, after representing . . . it was necessary" required expert testimony and were HCLCs). Such standards of care are not matters within the common knowledge of a lay person; expert testimony is necessary. *See FFE Transp. Servs., Inc. v. Fulgham*, 154 S.W.3d 84, 90 (Tex. 2004) ("Expert testimony is necessary when the alleged negligence is of such a nature as not to be within the experience of the layman." (quoting *Roark v. Allen*, 633 S.W.2d 804, 809 (Tex. 1982))); *cf. Roughley v. Tex. Tech Univ. Health Scis. Ctr.*, No. 2-08-222-CV, 2009 WL 161069, at *1–2 (Tex. App.—Fort Worth Jan. 22, 2009, no pet.) (per curiam) (mem. op.) (holding claim was HCLC when plaintiff alleged that provider failed to restrict him from working with certain chemicals because "whether it was medically necessary to order a person with a certain type of skin condition to avoid certain cleaning solutions . . . . [wa]s not a matter within the common knowledge of the lay person").

The same is true of Executor's allegation that Civitas failed to "regularly monitor[]" Decedent's "health and condition" and keep her under the "constant care" of a physician. The Texas Supreme Court has held that "[t]he supervision and monitoring of . . . nursing home residents and nursing services provided to [a resident] by [the nursing home's] staff [a]re part of [the resident's] health care," as a nursing home is expected to exercise professional "judgment[] about the care, treatment, and protection of individual patients and the patient populations in their facilities based on the mental and physical care the patients require." *Diversicare Gen. Partner*, 185 S.W.3d at 850.

12

In *Diversicare Gen. Partner*, a nursing-home resident accused the nursing home of failing to adequately supervise her to prevent injuries, failing to hire and train a sufficient number of qualified nursing staff, and failing to protect her from sexual abuse and assault by another resident. *Id.* at 845. The Texas Supreme Court held that these were HCLCs because "[t]his dispute between the parties [wa]s, at its core, over the appropriate standard of care owed to this nursing home resident; what services, supervision, and monitoring were necessary to satisfy the standard; and whether such specialized standards were breached." *Id.* at 849–54. A lay person would not have general knowledge regarding these issues; rather, expert testimony was required. *Id.* at 851.

Although Decedent was in an assisted-living facility rather than a nursing home, the two are sufficiently analogous to make *Diversicare* instructive. *See Emeritus Corp. v. Highsmith*, 211 S.W.3d 321, 327–28 (Tex. App.—San Antonio 2006, pet. denied) (applying *Diversicare* in assisted-living context and holding that claims were HCLCs). To determine whether Civitas failed to monitor Decedent's "health and condition" with sufficient "regular[ity]," the factfinder must consider what regularity is necessary to monitor what health indicators for a dementia patient living in an assisted-living facility—a dispute "over the appropriate standard of care owed to th[e assisted-living] resident; what services, supervision, and monitoring were necessary to satisfy the standard; and whether such specialized standards were breached." *Diversicare Gen. Partner*, 185 S.W.3d at 850; *see Omaha Healthcare Ctr.*, 344 S.W.3d at

13

394–95 (holding claim against nursing home for pest-control practices was HCLC and emphasizing that health care is statutorily defined to include acts performed or furnished by a provider during the patient's confinement); *Tex. W. Oaks Hosp.*, 371 S.W.3d at 182–86 (holding claims were HCLCs when dispute "at its core, [was] over the appropriate standards of care owed to [a] mental health professional in treating and supervising a psychiatric patient at the mental hospital, what services, protocols, supervision, monitoring and equipment were necessary to satisfy the standard, and whether such specialized standards were breached").

Even Executor's allegation that Civitas failed to clean Decedent's living space is a dispute "over the appropriate standard of care owed to th[e assisted-living] resident." *Diversicare Gen. Partner*, 185 S.W.3d at 850. In *Omaha Healthcare Ctr., LLC v. Johnson*, for example, a nursing-home resident died from a spider bite, and the resident's estate sued the nursing home for failing to protect her with proper pest-control inspections and procedures. 344 S.W.3d at 393. The Texas Supreme Court noted that a nursing home's responsibility to meet patients' fundamental needs goes beyond physical medical care and that the term "health care" is statutorily defined to include "*any act* performed or furnished, or that should have been performed or furnished, by any health care provider for, to, or on behalf of a patient during the patient's . . . confinement." *Id.* at 394–95 (quoting Tex. Civ. Prac. & Rem. Code Ann. § 74.001(a)(10)). Because "the underlying nature of [the estate's] claim" was "that [the nursing home] should have but did not exercise the care required of an ordinarily

14

prudent nursing home to protect and care for [the decedent] while she was confined there," it was an HCLC. *Id.* at 395.

Similarly, here, the core of Executor's fraud and breach of express warranty claims—including his allegation that Civitas failed to provide housekeeping services—relates to the "act[s] . . . [that] should have been performed or furnished, by a[] health care provider [i.e., Civitas] for . . . a patient [i.e., Decedent] during the patient's . . . confinement." Tex. Civ. Prac. & Rem. Code Ann. § 74.001(a)(10). This, again, goes to "the appropriate standard of care owed to th[e assisted-living] resident," *Diversicare Gen. Partner*, 185 S.W.3d at 850, and whether the assisted-living facility "should have but did not exercise the care required of an ordinarily prudent [assisted-living facility] to protect and care for [the decedent] while she was confined there." *Omaha Healthcare*, 344 S.W.3d at 395. As in *Diversicare*, Executor's allegations will require expert testimony. *See* 185 S.W.3d at 851. And if "expert medical or health care testimony is necessary to prove or refute the merits of the claim against a physician or health care provider, the claim is a health care liability claim." *Tex. W. Oaks Hosp.*, 371 S.W.3d at 182.

We affirm the trial court's preliminary determinations of Executor's fraud and breach of express warranty claims as HCLCs.

### b. Civitas's Breach of Contract

Executor's claim for breach of contract is reminiscent of his claims for fraud and breach of express warranty. His Original Petition accuses Civitas of breaching its Residency Agreement by, among other things,

- failing to "help [Decedent] respond to dietary and health needs, to include needs for special services";

- "failing to conduct [annual health] assessments and . . . failing to develop and update an individual care plan";

- failing to "provide three (3) nutritional well-balanced meals per day";

- failing to "regularly observe [Decedent's] health status to identify observable changes in physical, mental, emotional and social functioning";

- failing to provide adequate housekeeping services, as Civitas staff later "found old, rotten food tucked away in drawers" and "soiled clothing hidden under the mattress";

- "failing to take reasonable steps to ensure that Decedent's property was not stolen" as "part of a pattern and practice designed to increase the profits of [Civitas] at the expense of the Decedent's well[-]being"; and

- "assign[ing] various medical providers to the Decedent, some of whom were not physicians, without receiving the consent or approval of the Decedent or her POA."

Executor alleges that this is a "garden-variety breach of contract claim" rather than an HCLC, emphasizing that Civitas contractually committed to providing the relevant services. But the legislature has defined HCLCs to expressly include "cause[s] of action [that] sound[] in . . . contract." Tex. Civ. Prac. & Rem. Code Ann. § 74.001(a)(13). And more importantly, the gravamen of Executor's claim—like that

of his fraud and breach of warranty claims—is based on a departure from the accepted standards of health care.

Executor does not assert that the Residency Agreement contains an exhaustive inventory of Decedent's day-to-day "dietary and health needs," that it identifies what "respon[se]" was required to address Decedent's "needs," that it lists what "observable [health] changes" Civitas was required to monitor, or that it specifies the "regular[ity]" of Civitas's monitoring. Nor does he contend that the Residency Agreement specifies how thoroughly Civitas was required to search for waste in Decedent's room or what "reasonable steps" Civitas was required to take to protect Decedent's property. The implementation of these terms is based on the accepted standard of care for dementia patients in assisted-living facilities.[13] *See Omaha Healthcare*, 344 S.W.3d at 394–95; *Diversicare Gen. Partner*, 185 S.W.3d at 849–54.

We affirm the trial court's preliminary determination of Executor's breach of contract claim as an HCLC. Tex. Civ. Prac. & Rem. Code Ann. § 74.001(a)(13).

---

[13]In his reply brief, Executor states that several of his contract-related allegations are "based on the fact that [Civitas] failed to produce copies of any . . . care plans," "meal plans," or "records of [Civitas's] observations." He contends that "[n]o expert testimony is required" to prove his breach of contract claim because "[e]ither the documents were provided or they were not." But Executor's Original Petition does not allege that Civitas breached the Residency Agreement by failing to produce certain documentation; it alleges that Civitas breached by providing sub-par health care services.

### 4. Claims Against Elite

Executor's claims against Elite center on its performance of dental procedures that, according to Executor, were "unauthorized" and "unnecessary."

#### a. Elite's Fraud

To support his fraud claim against Elite, Executor's Original Petition alleges that Elite "represented to Decedent . . . that it was medically necessary to perform significant dental work, to include the extraction of five teeth and the fitting of a removable denture,"[14] that these representations were false, and that Elite's dentists were "licensed and board-certified dentists who . . . knew or should have known that less invasive procedures were an option, that the procedures recommended and performed were not in fact medically necessary, and that such invasive procedures posed a serious risk to Decedent's mental and physical health given her condition."[15]

By claiming that Decedent's dental procedures were not "medically necessary" and that the Elite dentists ignored medically superior options that "licensed and board-certified dentists . . . knew or should have known" about, Executor is

---

[14]In Executor's Original Petition, substantially similar allegations support his claim against Elite for breach of express warranty, but Executor drops this claim in his Second Amended Petition.

[15]Executor's Second Amended Petition removes his allegation that Elite's dentists were "licensed and board-certified dentists who . . . knew or should have known that less invasive procedures were an option, that the procedures recommended and performed were not in fact medically necessary, and that such invasive procedures posed a serious risk to Decedent's mental and physical health given her condition."

18

essentially arguing that the dental procedures "depart[ed] from accepted standards of medical care[] or health care." *Id.* And a lay person would not be familiar with the standards of health care that determine what is and is not a medically necessary dental procedure in a given situation; this will require expert testimony. *See FFE Transp. Servs.*, 154 S.W.3d at 90; *cf. Roughley*, 2009 WL 161069, at *1.

We therefore affirm the trial court's preliminary determination regarding Executor's claim against Elite for fraud.

### b. Elite's Assault and IIED

Executor next alleges that Elite assaulted Decedent and intentionally inflicted emotional distress on her by "extracting five teeth from Decedent's mouth and suturing her gums" as part of "an unauthorized and unnecessary dental procedure without informed consent."

"[A]ssault and battery claims are health care liability claims when"—as here—"the plaintiff's factual allegations are related to [health or] medical treatment provided by the defendant" and turn on the absence of the patient's consent. *Cf. Samson v. Small*, No. 01-09-00451-CV, 2011 WL 1529729, at *3–4 (Tex. App.—Houston [1st Dist.] Feb. 24, 2011, no pet.) (mem. op.) (holding battery claim was HCLC when patient alleged that doctor who performed surgical procedure installed spinal rods without his consent).

In *Murphy v. Russell*, for example, the Texas Supreme Court held that the plaintiff's battery claim was an HCLC subject to the expert-report requirement. 167

19

S.W.3d 835, 838–39 (Tex. 2005). The patient sued her anesthesiologist for administering a general anesthetic during a medical procedure, claiming that she had only consented to a local anesthetic. *Id.* at 837–38. Applying the Medical Liability Act's predecessor statute, the Texas Supreme Court noted that the plaintiff's battery claim "ar[o]se[] from treatment rendered by [the defendant]" and that the treatment "w[oud] not constitute a battery unless it [wa]s provided without the patient's consent." *Id.* at 838; *see id.* at 836 n.1. But there are "reasons for providing treatment without specific consent that do not breach any applicable standard of care" and "[t]he existence or nonexistence of such reasons is necessarily the subject of expert testimony." *Id.* at 838. Consequently, the patient could not prove her battery claim without proving a departure from the consent-related standard of care; her claim was an HCLC. *Id.* at 838–39.

Similarly, Executor's assault and IIED claims arise out of a dental procedure performed by Elite, and that procedure will not constitute assault or IIED unless the Executor proves that it was "unauthorized."[16] But the "failure to obtain consent does

---

[16]Although Executor alleges that Decedent gave neither consent nor informed consent, "[i]nformed-consent claims differ materially . . . from claims alleging that a patient gave no consent at all for the treatment." *Nikko Cosm. Surgery Ctr., Inc. v. Carroll*, No. 01-20-00752-CV, 2021 WL 3082911, at *4 (Tex. App.—Houston [1st Dist.] July 22, 2021, no pet.) (mem. op.). Reading Executor's Original Petition as a whole, he is asserting that Decedent "did not have capacity to give consent as evidenced by her diagnosis of dementia." In other words, his factual allegations assert a lack of consent rather than a lack of informed consent. *Cf.* Tex. Civ. Prac. & Rem. Code Ann. § 74.101 (providing that when a HCLC "is based on the failure of the . . . health care provider to disclose or adequately disclose the risks and hazards

not automatically result in liability," *id.* at 838, and whether the allegedly "unauthorized" procedure was liability-producing turns on the accepted standard of care for consent—the intricacies of which laymen are not generally familiar. *See id.* at 838–39. Executor's assault and IIED claims are thus HCLCs. *Cf. Vanderwerff v. Beathard,* 239 S.W.3d 406, 409 (Tex. App.—Dallas 2007, no pet.) (holding assault claim was HCLC when "[t]he threshold questions raised by [the] pleadings [we]re whether [the claimant] consented to treatment and whether [the provider's] examination was within the scope of a chiropractic examination" and such "questions cannot be answered without reference to the standard of care required of a chiropractic provider"); *Brzozowski v. Se. Baptist Hosp.*, No. 04-07-00031-CV, 2007 WL 3003141, at *1–2 (Tex. App.—San Antonio Oct. 17, 2007, pet. denied) (mem. op.) (holding claim was HCLC when patient alleged that hospital performed unconsented-to medical services and sued for false imprisonment, assault, and battery).

We affirm the trial court's preliminary determinations that these two claims are HCLCs.

---

involved in the medical care or surgical procedure . . . , the only theory on which recovery may be obtained is that of negligence in failing to disclose the risks or hazards that could have influenced a reasonable person in making a decision to give or withhold consent"); *Nikko Cosm. Surgery Ctr.*, 2021 WL 3082911, at *3–4 (noting that action for total lack of consent sounds in battery while lack of informed consent is a subspecies of negligence). Notably, though, Executor added an informed-consent claim to his Second Amended Petition, pleading it in the alternative. Either way, "[c]laims based on the failure to obtain informed consent are governed by Chapter 74 of the Civil Practice and Remedies Code." *Samson*, 2011 WL 1529729, at *3.

### 6.    Claims Against Both Civitas and Elite

The same allegedly "unauthorized" and "unnecessary" dental procedures form the basis for the conspiracy claim that Executor asserts against Civitas and Elite jointly. His Original Petition accuses Civitas and Elite of engaging in a conspiracy by "agree[ing] to unjustly enrich themselves and one another by facilitating and performing unauthorized invasive dental procedures on the elderly and mentally infirm that were not medically necessary and without informed consent." In essence, the alleged conspiracy between Civitas and Elite was to perform unnecessary and unauthorized dental procedures for profit.

Once again, whether the dental procedures were "necessary" and whether they required Decedent's specific "consent" will turn on specialized standards of health care. *See Murphy*, 167 S.W.3d at 838–39; *cf. FFE Transp. Servs.*, 154 S.W.3d at 90. Plus, Elite's dental services are part and parcel of its alleged conspiracy with Civitas, and "[c]laims for conspiracy . . . are also health care liability claims when, as in this case, the acts or omissions that form the basis of the plaintiff's allegations are an inseparable part of the rendition of health care services." *Samson*, 2011 WL 1529729, at *3–4 (holding conspiracy claim was HCLC when patient alleged that doctor who performed surgical procedure installed spinal rods without his consent then conspired to alter related entries in his medical records).

Executor, though, analogizes his conspiracy claim to the non-HCLC discussed in *Shanti v. Allstate Ins. Co.*, 356 S.W.3d 705 (Tex. App.—Houston [14th Dist.] 2011,

pet. denied). There, a group of car insurance companies sued a group of health care providers for alleged fraud, conspiracy, and unjust enrichment. *Id.* at 708–10. The insurers—who had paid settlements to personal-injury plaintiffs treated by the providers—claimed that the providers worked with the plaintiffs' attorneys to perform "uniform, 'cookie cutter,'" and unnecessary medical procedures at the attorneys' request, to provide documentation for the attorneys' cases, and to take a cut of the plaintiffs' personal-injury settlements rather than charging fees. *Id.* The insurers also accused the providers of falsifying related documents by, e.g., billing for services that were not performed by a medical doctor or supervised nurse practitioner, representing that the services were performed in honest and independent clinical judgment, concealing select patient files, and indicating that the personal-injury patients were liable for their own bills when they were not. *Id.* at 710. The Fourteenth District Court of Appeals held that these were not HCLCs. *Id.* at 712–13.

Even though "some of the[ providers' alleged] misrepresentations concern[ed] the medical necessity of certain referrals or procedures, the underlying nature of [the insurers'] claim [wa]s a complicated, multi-level scheme to defraud the insurance companies" and "d[id] not involve any deviation from a medical standard of care." *Id.* at 713. "Medical expert testimony would not be required to establish that [the providers] were willing participants in a conspiracy to commit fraud, or that they were engaging in a particular course of business as a means of extorting larger fees from insurers." *Id.* Plus, the court added, the insurers were not "claimants" under the

Medical Liability Act—they were not seeking to recover for bodily injury or death; they were not pursuing subrogation claims; and "[n]o part of [their] cause of action [wa]s derivative from an injury or death of another person." *Id.* at 713–14; *see* Tex. Civ. Prac. & Rem. Code Ann. § 74.001(a)(2) (defining "[c]laimant").

The allegations in this case are very different. Unlike *Shanti*, Executors' claims are based on Decedent's injury and death, and Executor's status as a "claimant" has not been challenged. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.001(a)(2). Moreover, the gravamen of Executors' conspiracy claim relates to Civitas's and Elite's alleged provision of dental care that deviated from the accepted standard of care for a patient in Decedent's circumstance. Executor does not allege that Elite extracted five teeth from every patient in a "'cookie cutter' fashion" or that that the extraction took place at the request of an attorney; he alleges that Decedent's "dental procedures . . . were not medically necessary" for her, and medical necessity is based on the accepted standard of dental care. *Cf. Shanti*, 356 S.W.3d at 708–10. While *Shanti* held that expert testimony was not required to prove the insurers' conspiracy claim, *id.* at 713, Executor has acknowledged that "medical expert testimony will likely be necessary" to prove his claims.[17] Thus, *Shanti* is not on point.

---

[17]Some of *Shanti*'s rationale has been invalidated by subsequent Texas Supreme Court precedent. Specifically, when the providers pointed out that the insurers had already designated experts to support their claims, *Shanti* stated that "the need for expert testimony is not dispositive as to whether a claim is a health care liability claim." *Shanti*, 356 S.W.3d at 716 (quoting *Tex. W. Oaks Hosp., LP v. Williams*, 322 S.W.3d 349, 353 (Tex. App.—Houston [14th Dist.] 2010), *rev'd*, 371 S.W.3d 171

24

The essence of Executor's conspiracy claim—much like his other claims—alleges a "departure from accepted standards of medical care[] or health care." Tex. Civ. Prac. & Rem. Code Ann. § 74.001(a)(13). We affirm the trial court's preliminary determination that Executor's conspiracy claim is an HCLC.

## IV. Conclusion

The plain language of the Medical Liability Act, together with the body of case law interpreting it, categorizes Executor's seven causes of action as HCLCs. We affirm the trial court's preliminary determinations under Texas Civil Practice and Remedies Code Section 74.353. *Id.* § 74.353; *see* Tex. R. App. P. 43.2(a).

/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice

Delivered: March 23, 2023

---

(Tex. 2012)). The Texas Supreme Court has since held the opposite. *Tex. W. Oaks Hosp.*, 371 S.W.3d at 182 ("[W]e now hold that if expert medical or health care testimony is necessary to prove or refute the merits of the claim against a physician or health care provider, the claim is a health care liability claim.").

25